UNITED STATES of America, Appellee,

v.

Carlos Manuel PARODI, Appellant.

UNITED STATES of America, Appellee,

v.

Edwin Barton CONWAY, Appellant.

UNITED STATES of America, Appellee,

v.

Robert Lee LAWS, Appellant.

Nos. 81–5215, 81–5216 and 81–5219.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 9, 1982.

Decided March 23, 1983.

Rehearing and Rehearing En Banc
Denied May 3, 1983.

---

Mark King Leban, Miami, Fla., for appellant Carlos Manuel Parodi.

D. Blake Yokley, Winston-Salem, N.C., for appellant Edwin Barton Conway.

David T. Flaherty, Jr., Lenoir, N.C., for appellant Robert Lee Laws.

Bruce C. Fraser, Winston-Salem, N.C., for appellant Joseph Bean Crosswell.

David B. Smith, Asst. U.S. Atty., Greensboro, N.C. (Kenneth W. McAllister, U.S. Atty., Greensboro, N.C., Becky M. Strickland, Paralegal Specialist, Carolyn D. Johnson, Third Year Law Student on brief), for appellee.

Before RUSSELL and WIDENER, Circuit Judges, and JAMES H. MICHAEL, Jr., United States District Judge for the Western District of Virginia, sitting by designation.

DONALD RUSSELL, Circuit Judge:

The appellants-defendants appeal their convictions under an indictment, which in one count charged a conspiracy to violate the federal narcotics statutes on the part of all the persons named in the indictment and charged the commission of certain overt acts in pursuance of the conspiracy by some of the persons named in the indictment.[1] As originally filed, the indictment named eleven persons; in a superseding indictment the number of defendants was reduced to ten. Of the ten named in the superseding indictment, two— Michael and Douglas Early, brothers— were never apprehended or arrested; the others named, however, were arrested. However, it appears that only five of those named were brought to trial.

At trial, all the defendants tried were convicted under the conspiracy count in the indictment. In addition, the defendant Conway was convicted under four counts charging the commission by him of overt

---

1. 21 U.S.C. §§ 846, 841(a)(1).

acts in pursuance of the conspiracy and the defendant Crump was acquitted of the count charging the commission by him of an overt act in connection with the conspiracy. After conviction, followed by a denial of a motion for acquittal after verdict under Rule 29(c), Fed.R.Crim.P., the five defendants appealed. While the appeals were pending, however, the defendants Crump and Crosswell moved voluntarily to dismiss their appeals and the motions were granted. The defendants who are presently appealing their convictions are accordingly the defendants Parodi, Conway and Laws.

In their appeals, the appealing defendants have raised two common claims of error and, in addition, have stated certain individual grounds for relief unique to them. Thus, all the defendants join in claiming trial error in failing to sequester DEA (Drug Enforcement Administration) Agent Ingram during trial and in permitting him to testify in rebuttal. They also complain of prejudice in the action of the district judge in allegedly interfering by addressing two questions to the witness Ozella at the conclusion of his cross-examination. The defendant Parodi individually charges error in the denial of his motion to sever and of his motion for acquittal. He, also, joins with the defendant Conway in alleging error in the district court's permitting testimony from Agent Ingram of prior consistent statements by the witness Ozella in response to the defendants' attack on the latter's credibility. The defendant Laws appeals individually from the admission into evidence of taped telephone conversations in which he participated. In addition to his joint objection with the defendant Parodi to Ingram's corroborative evidence, the defendant Conway raises two alleged errors unique to him. The first of these relates to the admission in evidence of a photograph of him with a known fugitive, one Turner. Conway further asserted that his convic-

tion, under a count charging an overt act in pursuance of the conspiracy, was inconsistent with the acquittal of his co-defendant Crump, who was charged with like involvement in a like overt act. We overrule all the claims of error and affirm the convictions from which appeals are taken.

I

■ We address initially the asserted errors common to the contentions of all the appealing defendants. The first of these is the alleged error in not sequestering the DEA agent Ingram as requested under Rule 615, Fed.R.Evid., and in later permitting him to testify.[2] It is true that Rule 615 mandates, upon motion, the sequestering of the witnesses in any case. Excluded from such mandatory requirement, however, is "an officer or employee of a party which is not a natural person designated as its representative by its attorney" at trial. It has been authoritatively determined, based on the legislative history of the Rule, that a government investigative agent involved in a criminal prosecution, such as Ingram, is within this exception. *United States v. Walker,* 613 F.2d 1349, 1354 (5th Cir.1980), *cert. denied,* 446 U.S. 944, 100 S.Ct. 2172, 64 L.Ed.2d 800; *United States v. Nix,* 601 F.2d 214, 215 (5th Cir.1979), *cert. denied,* 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 196; *United States v. Woody,* 588 F.2d 1212, 1213–14 (8th Cir.1978), *cert. denied,* 440 U.S. 928, 99 S.Ct. 1263, 59 L.Ed.2d 484 (1979); *In Re United States,* 584 F.2d 666, 667, 48 A.L.R.Fed. 480 (5th Cir.1978). The trial court thus has a right to make an exception from a general rule of sequestration in favor of the chief investigating agent of the government involved in a trial. *United States v. Frazier,* 417 F.2d 1138, 1139 (4th Cir.1969), *cert. denied,* 397 U.S. 1013, 90 S.Ct. 1245, 25 L.Ed.2d 427 *rehearing denied,* 398 U.S. 945, 90 S.Ct. 1850, 26 L.Ed.2d 284 (1970); *United States v. Wind-*

---

**2.** During Ozella's testimony, the defendants also complained that Ingram had been surreptitiously "coaching" the witness with nods or shaking of his head. Though the Government sharply disputed the charge, the trial judge resolved the issue by requiring Ingram to withdraw from the courtroom at that point. We find that the action taken by the district judge was the simplest remedy under the circumstances and we perceive no prejudice to any party.

*sor,* 417 F.2d 1131, 1133 (4th Cir.1969); *United States v. Pellegrino,* 470 F.2d 1205, 1208 (2d Cir.1972), *cert. denied,* 411 U.S. 918, 93 S.Ct. 1556, 36 L.Ed.2d 310 (1973). Ingram met fully the test of investigating officer capable of being designated by the Government as "its representative" at trial under Rule 615 and his exclusion by the district judge from the order sequestering the witnesses in this case was clearly authorized and was not error.

If it be conceded the district judge had the power to permit an investigating officer such as Ingram to remain in court during trial under Rule 615, Parodi contends that such permission, if granted, should be conditioned upon requiring the officer, if he is to be permitted to testify, to testify as the first witness in the case. He relies on *Frazier* as authority for so conditioning permission for the investigating officer to remain in court at trial under Rule 615. *Frazier* did suggest such a practice but it coupled such suggestion with this limitation: "unless in the judge's considered opinion, it would unduly break the continuity and seriously impair the coherence of the Government's proof." 417 F.2d at 1139.[3]

■ We find no abuse of discretion on the part of the district judge in permitting such agent in this case to testify at the conclusion of the Government's case in response to the defendant's effort to impeach the testimony of one of the government's principal witnesses. There was only one part of Ingram's testimony that could have been admitted logically at the beginning of the trial without confusing the order of proof. This testimony related to the search of Parodi's apartment. There was, though, no substantial difference between the agent's testimony in this regard and that of the defendant Parodi. The defendant could not, therefore, have been at all prejudiced by the delay in offering this evidence.[4] The other evidence of Ingram logically and sequentially followed all the other evidence in the case. Ingram in his testimony, summarized certain telephone records. His summary would have been unintelligible and confusing to the jury until after the records had been proved. Moreover, the witness, in his testimony on this point, did not go beyond what was obvious in the records themselves, as those records had been proven and testified to by other witnesses in the case. Finally, Ingram in his testimony related what Ozella had told him in interviews about the narcotics operations which was the subject of the prosecution. Ozella had previously been extensively cross-examined with reference to these interviews and about his statements to agent Ingram during those interviews. The government could not have offered testimony through the witness Ingram with reference to those statements made to such witness by Ozella until after Ozella had testified and the defendants had sought to impeach his credibility with reference to these events. Such are conditions upon the admission of prior statements of a declarant consistent with his trial testimony in support of his credibil-

---

**3.** *In Re United States, supra,* it was stated by one of the panel, concurring and dissenting, that:

"I find nothing in Rule 615 or in Rule 611 which allows the District Court to modify or restrict the government's selection of such a representative .... Nothing in Rule 611 indicates to me that this right can then be compromised by requiring such a representative to testify at any given time in the proceeding." 584 F.2d at 668.

The author in Weinstein's Evidence, vol. 3, 615–9 and 615–10, criticizes the view expressed in this concurring and dissenting opinion.

**4.** An absolute rule that to allow an investigating officer to remain in the courtroom during trial must be conditioned on requiring the officer, if he is to testify, to testify first and, if this requirement is not followed, the investigating officer must not be allowed to testify, would conflict with the repeated decisions of this court that the trial judge "may exercise his discretion in permitting a witness to testify at trial [even] when the witness had earlier been present in court contrary to the judge's [sequestration] order," *United States v. Marson,* 408 F.2d 644, 650 (4th Cir.1968), and that the discretion to permit the testimony of the agent will not be disturbed in the absence of prejudice "sufficient to constitute an abuse of discretion," *United States v. Warren,* 578 F.2d 1058, 1076, n. 16 (5th Cir.1978), *cert. denied,* 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980).

ity. *United States v. Strand,* 574 F.2d 993, 997, n. 4 (9th Cir.1978) ("... since the defendant (whose exculpatory testimony he sought to support with prior consistent statements by him) had not yet testified, the statements were not admissible as prior consistent statements under Fed.R.Evid. 801(d)(1), see 4 Weinstein's Evidence ¶ 801(d)(1)(B)[01], at 801–100 (1975)"). It was thus not permissible for Ingram to testify in corroboration of Ozella until after the latter had testified and been impeached in cross-examination. This is precisely the type of situation in which *Frazier* found it would be inappropriate to require the witness to testify first. There was accordingly no abuse of discretion by the district court and no improper prejudice suffered by the defendants in permitting Ingram to testify when he did.

The defendants further complain of what they characterize as "the Court's interjecting itself into the prosecutorial function and rehabilitating the chief prosecution witness, Larry Ozella, by strongly implying, through its questioning, that Ozella was telling the truth ...."[5] However, the role of the district judge particularly in an involved conspiracy case with a large number of defendants such as here, is "not that of an umpire or of a moderator at a town meeting. He sits to see that justice is done in the cases before him; and it is his duty to see that a case on trial is presented in such way as to be understood by the jury, as well as by himself. He should not hesitate to ask questions for the purpose of developing the facts; and it is no ground of complaint that the facts so developed may hurt or help one side or the other .... [H]e has no more important duty than to see that the facts are properly developed and that their bearing upon the question at issue are clearly understood by the jury." *Simon v. United States,* 123 F.2d 80, 83 (4th Cir.1941), *cert. denied,* 314 U.S. 694, 62 S.Ct. 412, 86 L.Ed. 555; *United States v. Johnson,* 657 F.2d 604, 606 (4th Cir.1981); *cf., United States v. Nobles,* 422 U.S. 225, 230–31, 95 S.Ct. 2160, 2166, 45 L.Ed.2d 141 (1975); *United States v. Pinkey,* 548 F.2d 305, 308 (10th Cir.1977). Especially when there is a "seeming inadequacy of examination or cross-examination by counsel, or [there appears to be a necessity] to draw more information from reluctant witnesses or experts who are inarticulate or less than candid," we have said that it is entirely proper for the district judge to intervene with pertinent questions. *United States v. Cassiagnol,* 420 F.2d 868, 879 (4th Cir.1970), *cert. denied,* 397 U.S. 1044, 90 S.Ct. 1364, 25 L.Ed.2d 654; *United States v. Bartlett,* 633 F.2d 1184, 1188 (5th Cir.1981), *cert. denied,* 454 U.S. 820, 102 S.Ct. 101, 70 L.Ed.2d 91; *United States v. McDonald,* 576 F.2d 1350, 1358 (9th Cir.1978), *cert. denied,* 439 U.S. 830, 927, 99 S.Ct. 105, 312, 58 L.Ed.2d 124, 320. Of course, in exercising this power, the trial judge must always remember that he occupies "a position of preeminence and special persuasiveness" in the eyes of the jury, *Pollard v. Fennell,* 400 F.2d 421, 424 (4th Cir.1968), and, because of this, he should take particular care that his " 'participation during trial—whether it takes the form of interrogating witnesses, addressing counsel, or some other conduct—never reach[es] the point at which it appears clear to the jury that the court believes the accused is guilty,' " *United States v. Robinson,* 635 F.2d 981, 984 (2d Cir.1980), *cert. denied,* 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed.2d 852 (1981); *United States v. Middlebrooks,* 618 F.2d 273, 277 (5th Cir.1980), *cert. denied,* 449 U.S. 984, 101 S.Ct. 401, 66 L.Ed.2d 247

---

5. These questions were:
 "THE COURT: Mr. Ozella, there have been several questions with reference to your immunity and with reference to your cooperation, and with reference to what may occur at the trial at the time you're sentenced in State Court. With reference to all of those matters does that have any bearing on you with reference to telling the truth at this time?

 "THE WITNESS: I'm not going to lie no matter what, your Honor.
 "THE COURT: Regardless of what has happened in the past and may happen in the future, you're saying you're telling the truth at this time?
 "THE WITNESS: Yes, sir.
 "THE COURT: All right. You may examine him, ...."

or partakes of "'the heat and partisanship of the advocate,'" *Wallace v. United States,* 281 F.2d 656, 665 (4th Cir.1960), *cert. denied,* 370 U.S. 923, 82 S.Ct. 1564, 8 L.Ed.2d 503 (1962), quoting from *Graham v. United States,* 12 F.2d 717, 718 (4th Cir.1926); *United States v. McDonald, supra,* 576 F.2d at 1358, or gives the appearance of bias or partiality in any way or becomes so pervasive in his interruptions and interrogations that he may appear to usurp the role of either the prosecutor or the defendant's counsel, *United States v. De Sisto,* 289 F.2d 833, 834 (2d Cir.1961).[6] And if the trial judge's behavior whether in commenting or in interrogating witnesses during trial reaches such a level of prejudice "that it denied any or all the appellants a fair, as distinguished from a perfect, trial," a new trial is required. *United States v. Robinson, supra,* 635 F.2d at 984.

The defendants' basic claim in connection with this phase of their appeal is directed, as we have said, to the district judge's inquiry of Ozella at the conclusion of the cross-examination of the witness by Parodi's counsel and before re-direct whether the grant of immunity and what might occur at the time of his sentencing in State court, would "have any bearing on [him] with reference to telling the truth at this time" and whether, "[r]egardless of what has happened in the past and may happen in the future, you're saying you're telling the truth at this time." The witness answered these questions affirmatively. In a bench motion, the defendant Parodi moved for a mistrial, saying that the district judge "on a very crucial issue [had] intervened and asked questions of this witness as reference his truth and veracity, and I think the relationship should have been left to the defense attorney.... The fact that this Court asked that question and [the witness] responded to this Court in that manner will add undue influence and will prejudice the

defendant in such effect and I move for a mistrial at this time." The defendants do not argue that the two questions directed to the witness Ozella, on which they primarily rest this claim of error, were not relevant or proper. They apparently concede that the questions were relevant. But the defendants assert that the trial judge should have let Government's counsel ask these questions and that the district judge, by interfering to ask the questions himself, gave a special aura of believability and an improper degree of plausibility to the witness' answer in the minds of the jury.

■ Unquestionably, it would have been preferable for these questions to have been asked by Government counsel. But it does not follow that simply because the district judge addressed the questions to the witness the defendants suffered such prejudice that they were denied "a fair, as distinguished from a perfect, trial," necessitating a reversal of the convictions herein.[7] In order to determine whether the district judge so abused his proper prerogatives in this regard that a fair trial was denied the defendants, it is necessary to look not merely at the challenged questions in isolation but also at the demeanor and conduct of the trial judge throughout the trial, to search the record for evidence of partiality or bias that might indicate a belief on the judge's part that the defendants were "guilty" or suggest that he had usurped the function of prosecutor. The defendant recognized this and did seek to pluck from the voluminous record in this case some other evidence of prejudicial interference with the testimony by the district judge. They identified only two incidents which they suggest might have indicated some bias by the district judge. Neither incident will support the suggestion.

■ The first of these alleged interruptions consisted of a simple inquiry by the district judge, during Ozella's testimony

---

**6.** In *De Sisto,* the trial judge asked 3,115 questions, the prosecution 1,381 and the three defense counsel 3,330. This was overmuch participation by the district judge and required reversal of the conviction in that case. *See United States v. Mahler,* 579 F.2d 730, 736–37

(2d Cir.1978), *cert. denied,* 439 U.S. 872, 99 S.Ct. 205, 58 L.Ed.2d 184.

**7.** *United States v. Robinson, supra,* 635 F.2d at 984.

about his interviews with the DEA agent Ingram when he detailed his involvement in the conspiracy, whether these interviews occurred before or after the witness was granted immunity. This was a perfectly proper question and we perceive no impropriety in the district judge's action. Equally innocuous was the other action of the district judge instanced as evidencing an improper interference by him with the proof. In his confession given Ingram, Ozella had admitted his guilt both of the state offense of which he already stood indicted and of possible federal charges. Parodi's counsel wanted to ask Ozella why he continued to plead "not guilty" in the state prosecution after he had confessed to federal officers his guilt. The district judge gave two reasons for refusing to permit the inquiry. In the first place, he feared accurately that it would open up an irrelevant issue which would unnecessarily lengthen the trial and confuse the jury. There was an intimation by the Government that, if this inquiry were pursued, proof would be adduced of Ozella's fear for his safety. Secondly, the district judge regarded the whole inquiry irrelevant: A defendant has an absolute right to plead "not guilty." Certainly, to have permitted the inquiry to proceed would have opened up a new and diverting issue that might have been far more damaging to the defendant Parodi in particular than to the Government. The defendants seemingly saw this and appeared to acquiesce in the district judge's ruling. Whether the defendants did acquiesce or not, the ruling certainly did not prejudice the defendants and it manifestly was made by the district judge perhaps more for preventing prejudice to the defendants than favoring the Government. In any event, these two incidents offer no support to a contention that the conduct of the district judge was not throughout the trial fair and impartial.

When viewed in its entirety, and considering all the matters cited by the defendants, the record demonstrates that the conduct and manner of the district judge during trial represented a model of impartiality and manifested a freedom from bias or favoritism. He showed remarkable patience under at times considerable provocation. He certainly engaged in no "badgering" of the witnesses or the defendants. Such interrogation of the witnesses or defendants as he engaged in was minimal when viewed in the light of the trial's length, and there is no evidence that, in any of his questioning, including those cited by the defendants, he was doing anything more than seeking to clarify the relevant issues for the jury without any effort to aid or prejudice either the prosecution or the defendants. It is significant that the defendants do not suggest that at any time during the trial did the trial judge evidence a "seeming hostile manner," make "sharp, critical comments" on the arguments of counsel for either the Government or the defendants; there were no "extensive questioning," no "undue interruptions" on the part of the district judge. His conduct was a refreshing contrast with that found objectionable in *Cassiagnol,* where we said (420 F.2d at 879):

"The judge's exhaustive questioning of appellant Franco, often in a chiding, seemingly hostile manner and often indicating that the judge was suggesting or seeking a specific answer other than the one which had been given, coupled with the judge's persistent and repeated interruptions of defense counsel during the trial and during counsel's summation with sharp, critical comments, undoubtedly tended to prejudice this defendant before the jury and deprive her of a fair trial."

There was no addressing questions to witnesses for the defendants which "clearly reflected disbelief in [their] version" of the facts, as in *United States v. Nazzaro,* 472 F.2d 302, 309 (2d Cir.1973), nor did the district judge here "interrogate, cross-examine, threaten and intimidate the [defendant's chief] witness and ... threaten defense counsel with contempt" and actually charge the witness with "attempted perjury," as in *United States v. Pena-Garcia,* 505 F.2d 964, 965–67 (9th Cir.1974). Even more than in *United States v. Pomponio,* 563 F.2d

659, 667–68 (4th Cir.1977), *cert. denied* 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538 (1978), in which we found no reversible error, there was no evidence of "badgering" of either the defendants, witnesses or counsel, no expressions "adverse to defendants" or "impermissible advocacy" on the part of the district judge in this case. And counsel for the defendant Parodi recognized that the district judge had manifested throughout the trial an unbiased attitude and one which always sought to provide the defendants a fair opportunity to present their defense. Thus, in advancing his Rule 29(c) motion, he said:

> "This Court knows that any questions I have about the conduct of this Court is out of a lot of respect because this Court treated my client, I feel, with an openended examination, open-ended arguments. At no time was any counsel in this courtroom terminated from saying what he wanted to, notwithstanding the fact that we double-lengthened the trial doing so. This Court was fair. What I'm saying, it is not the motive of why the Court asked it—"

■ Considering, as we must, the record as a whole, we cannot believe that simply because the trial judge himself asked these two questions of Ozella the defendants were so prejudiced that it can be said they were denied a fair trial. The only way in which it could be said that this action of the district judge prejudiced the defendants is that it could be construed as an indication by him that he considered Ozella a credible witness. But he very clearly stated to the jury at the beginning of the trial that, "no statement, ruling, remark or comment which I might make during the course of the trial is intended to indicate to you my opinion as to how you should decide the case, or to influence you in anyway." In his instructions to the jury at the conclusion of the testimony, he repeated to the jury that its members were the sole judges of the credibility of the witnesses and added that "nothing said in these instructions—nothing in any form of the verdict prepared for your convenience—is to suggest or to convey in anyway or manner any intimation as to what verdict [he thought] you should return." In the face of these repeated disclaimers of any purpose of influencing the jury in resolving the credibility of the witnesses and of the evidence of the district judge's impartiality and evenhandedness throughout the trial, we are unable to find that the action of the district judge complained of denied the defendants a fair trial.

## II

We turn now to the individual claims of error raised on appeal by the three appellants. We address first the three contentions made by Parodi which are unique to him. The first of these—and the one most earnestly pressed by him—is the district court's alleged error in denying him a severance. It is his position that, in essence, the government's case against him depends on the testimony of the witness Larry Ozella. For purposes of his motion, he centered on one particular event testified to by Ozella, disregarding any other facts or circumstances connecting him with the drug operation as testified to by Ozella. This testimony of which he complained identified Parodi as present in the home of his co-defendant Michael Early in Miami on June 18, 1980 when Early conducted a test on three and a half kilos of cocaine. According to Ozella, four persons were present on this occasion: Parodi, Early, Ozella and Conway. Parodi denies that he was present. It is his argument that he needs the testimony of Early and Conway to support his denial. Early, however, absconded and is unavailable, leaving, according to Parodi's argument, only his co-defendant Conway as a possible witness available to support his (Parodi's) denial. It is said that Conway will refuse to testify on Fifth Amendment grounds but Parodi's counsel asserts, on the basis of what he had been told by Conway's counsel, that it is more likely Conway would testify if there is a severance and if *he (Conway) is tried before Parodi.* Parodi argues that, under these circumstances and facts, the granting of his motion for a severance was mandated under *United States v. Shuford,* 454 F.2d 772 (4th Cir.1971).

██ Ordinarily, persons, properly joined in an indictment, are to be tried together and this is particularly so if a conspiracy is charged, *United States v. Provenzano,* 688 F.2d 194, 199 (3d Cir.1982), *United States v. Papia,* 560 F.2d 827, 836 (7th Cir.1977), *United States v. Kahn,* 381 F.2d 824, 838 (7th Cir.1967), *cert. denied,* 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661. Where the motion for severance is based, as here, on the asserted need for a co-defendant's testimony, the moving defendant must establish (1) a bona fide need for the testimony of his co-defendant, (2) the likelihood that the co-defendant would testify at a second trial and waive his Fifth Amendment privilege, (3) the substance of his co-defendant's testimony, and (4) the exculpatory nature and effect of such testimony. *United States v. Butler,* 611 F.2d 1066, 1071 (5th Cir.1980), *cert. denied,* 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35, quoted in 1 Wright, *Federal Practice & Procedure,* § 225, p. 832 (2d ed. 1982). Given such a showing, the court should (1) examine the significance of the testimony in relation to the defendant's theory of defense; (2) assess the extent of prejudice caused by the absence of the testimony; (3) pay close attention to judicial administration and economy; (4) give weight to the timeliness of the motion, and (5) consider the likelihood that the co-defendant's testimony could be impeached. *United States v. Provenzano,* 688 F.2d at 199; *United States v. Duzac,* 622 F.2d 911, 912 (5th Cir.1980), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 570, 66 L.Ed.2d 471; *United States v. Butler,* 611 F.2d at 1071; *United States v. Finkelstein,* 526 F.2d 517, 523–24 (2d Cir.1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976).

██ In satisfying the requirement for a showing that the co-defendant would testify and waive his Fifth Amendment privilege at a severed trial, the movant is not required to establish such willingness to "an absolute certainty"; "[a] reasonable probability . . . that the proffered testimony would, in fact materialize" and that the "co-defendant would have waived his Fifth Amendment" right at a separate trial has been held sufficient. *United States v. Shuford, supra,* 454 F.2d at 778. Whether such likelihood of the co-defendant's testifying may be shown by a statement of counsel for the movant if made in the presence of the co-defendant or his counsel and not disavowed by them, however, is open to some doubt. See *United States v. Vigil,* 561 F.2d 1316, 1317–18, n. 1 (9th Cir.1977).[8] In any event, however, the requirement of a showing of willingness to testify if there is a severance is not met when that offer to testify is further conditioned on the co-defendant's case being tried first. *United States v. Becker,* 585 F.2d 703, 706 (4th Cir.1978), *cert. denied,* 439 U.S. 1080, 99 S.Ct. 862, 59 L.Ed.2d 50 (1979); *United States v. Frazier,* 394 F.2d 258, 261 (4th Cir.1968), *cert. denied,* 393 U.S. 984, 89 S.Ct. 457, 21 L.Ed.2d 445; *United States v. Ruppel,* 666 F.2d 261, 268–69 (5th Cir.1982), *cert. denied,* —— U.S. ——, 102 S.Ct. 3487,

**8.** *Vigil* says that it is doubtful that such a statement of counsel, even if made in the presence of counsel for the co-defendant and not disavowed by him, meets the requirement of showing the willingness of the co-defendant to testify if severance were granted. It is argued by Parodi, however, that *Shuford* holds that such a showing is sufficient. But, as the Court in that case emphasized, in answer to the Government's argument that the showing was insufficient: "But [the moving defendant] and [the co-defendant] indicated quite clearly to the trial judge not only that [the co-defendant] would testify if granted a severance, but also the precise content of the expected testimony and its importance." (Italics added.) 454 F.2d at 778. It is thus evident that the ruling in that case was based on what the movant and the co-defendant *both "indicated"* clearly to the trial judge "and not merely on a statement of the movant's counsel in the presence of the co-defendant or his counsel.

*United States v. Martinez,* 486 F.2d 15, 22 (5th Cir.1973), is also cited by Parodi as holding that the statement of movant's counsel made in the face of silence on the part of the co-defendant, was sufficient. The representation of the co-defendant's willingness to testify in that case was, as in *Shuford,* made both by counsel for the moving defendant *and by counsel for the co-defendant.*

The Court in *Vigil* reviewed both of these cases (*Shuford* and *Martinez*) and still said that it was questionable that silence under these circumstances could be taken as testimony supporting the statement of counsel.

73 L.Ed.2d 1369; *United States v. Haro-Espinosa,* 619 F.2d 789, 793 (9th Cir.1979). In *Frazier,* the Court, in finding the condition that the co-defendant be tried first vitiated the good faith of the proffer, branded the offer as in effect a simple alibi-swapping device. And in *Becker,* the Court said that to grant a severance under such a condition "would allow co-defendants to employ a motion for severance to obtain benefits that they would not have but for their joint indictment." 585 F.2d at 706.

■ The requirement that the movant establish the "exculpatory nature and effect" of the co-defendant's testimony demands more than a "vague and conclusory" statement of counsel of facts "of purely cumulative or negligible weight or probative value;" the showing must be sufficiently definite for a determination by the trial court of the testimony's "exculpatory nature and effect." *United States v. Butler, supra,* 611 F.2d at 1071; *United States v. Provenzano, supra,* 688 F.2d at 199. This does not mean that the showing should be under oath, *Shuford, supra,* 454 F.2d at 778, though the trial court may, in a proper case, require that it be under oath, *Becker, supra,* 585 F.2d at 706–07. However, it does mean that the showing must be such as to establish that the moving defendant "will be unable to obtain a fair trial without severance, not merely that a separate trial would offer him a better chance of acquittal," *United States v. Papia, supra,* 560 F.2d at 836; *United States v. Moschiano,* 695 F.2d 236, 246 (7th Cir.1982), or an opportunity to proffer evidence which "merely contradict[s] part of the Government's proof," *United States v. West,* 670 F.2d 675, 680 (7th Cir.1982), *cert. denied,* —— U.S. ——, ——, 102 S.Ct. 2944, 2972, 73 L.Ed.2d 1340, 1359; *United States v. Papia,* 560 F.2d at 837. In reaching its conclusion on this re-

quirement, the trial court may too assess, as we have said, "[t]he degree to which the testifying co-defendant could be impeached," *United States v. Provenzano, supra,* 688 F.2d at 199.[9]

■ Judicial economy and timeliness are likewise factors which the precedents declare are to be considered by the trial court in ruling on any motion for severance. The weight to be given such consideration varies with the strength of the moving defendant's presentation and the type of case. The consideration, though, becomes particularly important "[w]here severance would necessitate a great number of otherwise unnecessary trials or the duplication of an unusually complex trial, a district court, in the exercise of its discretion, could well consider these factors as possible counterweights to the benefits accruing to the moving defendant from severance in the particular circumstances." *United States v. Shuford, supra,* 454 F.2d at 777, n. 5.

■ Finally, when there is an appeal from a district court's denial of a severance as here, the decision of the district court denying severance will not be disturbed "unless the denial of a severance deprives the defendants of a fair trial and results in a miscarriage of justice," *United States v. Becker, supra,* 585 F.2d at 706; *United States v. Moschiano, supra,* 695 F.2d at 245, or was so manifestly prejudicial that it outweighed the dominant judicial concern with judicial economy and compelled the exercise of the trial court's discretion to sever, *United States v. Papia,* 560 F.2d at 836–37.

■ Applying these principles to the facts of this case, we are unable to find that the refusal of a severance was such an abuse of discretion as to deny the defendant Parodi a fair trial. As stated by Parodi,

**9.** *See also, United States v. Taylor,* 562 F.2d 1345, 1362–63 (2d Cir.1977), *cert. denied,* 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (Court found unreliability in the co-defendant's proposed testimony because "his then-anticipated conviction for the conspiracy charged in this indictment would have subjected his testimony to significant impeachment . . . .") and in *United States v. Metz,* 608 F.2d 147, 156 (5th Cir.

1979), *rehearing en banc denied,* 613 F.2d 315 (5th Cir.1980), *cert. denied,* 449 U.S. 821, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980); and *United States v. Finkelstein,* 526 F.2d at 545 (severance denied, in part, because of the likelihood that the "testimony [of the co-defendant] would have been subject to substantial damaging impeachment by grand jury minutes.")

any likelihood of Conway's testifying was conditioned on his (Conway's) trial being held first. Such a proffer failed to meet the test stated in *Becker, supra,* 585 F.2d at 706–07. This should be sufficient to dispose of this claim of error. But there are other reasons to sustain the denial of a severance. Conway's testimony, even if it should accord with what Parodi claims, would not be exculpatory, nor would it be of significant probative value to Parodi's theory of defense. It would relate merely to whether Conway was present in Early's house on June 18 when Early, in the presence of Parodi, tested some cocaine. Conway's presence is not the critical point, however. The important fact is whether Parodi was there. Simply because Ozella may have been wrong in recalling whether Conway was present would not prove that Parodi had not been present when Early tested the cocaine. Moreover, Conway's denial of his presence (assuming he would deny it) would be suspect. Ozella's testimony was that before Parodi arrived Conway had confessed to a sale of cocaine by him and Early. If he were to admit he had been present, Conway would be admitting his own involvement in the drug operation. Such an admission could not be expected. Finally, the one event to which Conway's testimony, if given, would relate is but one of a substantial number of other circumstances, many of which were more significant than the event to which Conway's possible testimony would relate, that link Parodi to Early's drug operation. This single event could be eliminated and the Government would still have presented sufficient circumstantial evidence to support a guilty verdict against Parodi, as we later point out. It is difficult under the circumstances to find that Parodi was prejudiced by the absence of Conway's testimony in what might be under the most favorable view merely a contradiction of one relatively minor item in Ozella's extensive testimony not truly exculpatory of Parodi. In addition, it is highly unlikely that Conway would have testified so long as any charges remained open against him. He alone of the defendants present at trial, did not testify in his own defense.

Finally, unlike *Shuford* this is a complicated conspiracy case, involving many defendants and built out of a large number of circumstances occurring over a substantial period of time at various locations. In *Shuford* the issue centered on one simple fact, *i.e.,* the instructions given by the defendant to his employee for the billing of a single charge made against one single individual on one day. The Government's witness gave one version of the instruction; the defendant a contradictory one. If the defendant's version were the true one, he was innocent; if the witness' version were accurate, the jury could find him guilty. The co-defendant was expected to testify, if severance were granted, that the defendant's version was correct. The co-defendant's testimony would have been exculpatory and went to the heart of the Government's case. That is not this case.

Parodi's second attack is against the admission of Ingram's testimony detailing the statements made by Ozella in Ingram's interviews of Ozella. This testimony was offered to rebut the suggestions and insinuations in the cross-examination of Ozella by Parodi's counsel that Ozella's testimony at trial was different from the statements given by him to Ingram. When the evidence was first offered, Parodi's counsel objected that it was inadmissible hearsay representing as it did statements of one co-conspirator made "after the date of the alleged conspiracy . . . [and that] any statements made at this time are not in furtherance of the conspiracy . . . and would be hearsay as to these defendants." The district judge responded to the objection by commenting that he assumed the Government was offering this testimony of Ingram "to corroborate Mr. Ozella, if it does." Government's counsel confirmed that the testimony was being offered under the authority of *United States v. Weil,* 561 F.2d 1109 (4th Cir.1977) "to rehabilitate our witness (Ozella) with prior consistent statements if they are in fact consistent." Counsel for Parodi at this point stated his position thus:

"Your Honor, just to say what did the man tell you would not be consistent with

the ruling in [*Weil*]. If there are specific places, specific prior inconsistent statements that the Government wants to reinstate the credibility of the witness, there is where he would be limited under that ruling [in *Weil*]—just to say what he did tell you and let everything they want to come out—If there are specific areas the Government feels that Ozella and Johnson were impeached on and he has prior consistent statements to reinstate their credibility, that might be the limited area he can go to. My argument still stands this is hearsay of what either one of those witnesses said in October of '80."

The district judge ruled the testimony would be admissible for the limited purpose of corroboration. Counsel for the defendant Conway then requested a special instruction on the use of such testimony. After a bench conference with counsel for the Government and the defendants, the district judge gave the jury a special instruction, to which there was no objection.

As Ingram's testimony progressed, Parodi's counsel raised but two specific objections to such testimony. On both occasions, the testimony related specifically to Parodi; in other words, Parodi's counsel objected to Ingram's corroborating testimony only when that testimony concerned directly Parodi. The first occurred when Government counsel inquired of the witness whether Ozella had quoted Early as identifying by name "Carlos" as his source of supply for cocaine. Parodi's counsel objected to the question, arguing that:

"Nowhere in Mr. Ozella's testimony did he say Carlos was a source.... He never made the statement that he was a source and for the Government to try to get that statement from this witness, when they couldn't get that statement from the first witness, is not reinstatement of credibility by a prior consistent statement."

This objection was sustained by the district judge. The second objection offered by Parodi's counsel during Ingram's testimony followed the inquiry by Government counsel of Ingram "concerning his [Ozella's] first meeting with Carlos [Parodi]." The ground of counsel's objection in this case was that he had not sought in his cross-examination of Ozella to impeach him about this event ("I just examined him; I didn't try to impeach him at all"). The district judge overruled this objection. Ozella had first told Ingram, according to the latter's testimony, that it was Parodi who, on the occasion, said that "we'll get something better" to replace the "flaky" cocaine which a customer had rejected. However, Ingram testified that later Ozella volunteered that he was in error in ascribing this statement to Parodi, that the statement had been made by Early. This testimony corroborated the contention made by Parodi's counsel in his cross-examination that, while Ozella had earlier identified Parodi as the utterer of these words, he later corrected his statement by identifying Early as the speaker. This testimony certainly was not prejudicial to Parodi's defense. To summarize, Parodi's counsel entered two specific objections to questions addressed by Government counsel to Ingram. Parodi's objection was the same on both occasions. Moreover, the objection in one case was sustained and, though the objection was not sustained in the second case, the admission was unquestionably harmless. The important fact, however, is that at no time at trial did Parodi object to Ingram's testimony of prior consistent statements by Ozella because such statements were made after Ozella was alleged to have a motive to fabricate.

Actually, it was not until after the conviction of the defendants that Parodi, by a motion under Rule 29(c), objected to Ingram's testimony of prior consistent statements by Ozella, corroborative of his testimony in chief, as inadmissible because made after the time that Ozella had a motive to falsify. This delay was not because counsel for Parodi was ignorant of the ground on which he now asserts inadmissibility. *Cf., DiPaola v. Riddle,* 581 F.2d 1111, 1113–14 (4th Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979). All the facts on which Parodi bases his present claim of inadmissibility (*i.e.,* that Ozella's

prior consistent statements were made after he had a motive to falsify) were fully developed by Parodi's counsel in his cross-examination of Ozella before Ingram was even called as a witness.

 Parodi's belated attack after conviction on Ingram's testimony of Ozella's prior consistent statements because these were made after Ozella had a motive to fabricate violated Rule 103, Fed.Rules of Evidence. Rule 103 requires that, to preserve for appellate review an objection to evidence, the objection must be "(1) specific, (2) timely, and (3) of record." 21 Wright & Graham, *Federal Practice & Procedure*, § 5036 p. 174 (1977 ed.). The mandate for specificity in the Rule imposes upon the objecting party the obligation to "object with that reasonable degree of specificity which would have adequately apprised the trial court of the true basis for his objection . . . ." *United States v. Fendley*, 522 F.2d 181, 186 (5th Cir.1975); and would have "clearly stated the specific ground now asserted on appeal," *United States v. Maultasch*, 596 F.2d 19, 24 (2d Cir.1979). An objection is clearly lacking in the requisite specificity when the objection is " 'too loosely formulated and imprecise' to apprise the trial court of the legal grounds for [the] complaint." *United States v. Arteaga-Limones*, 529 F.2d 1183, 1199 (5th Cir.1976), *cert. denied*, 429 U.S. 920, 97 S.Ct. 315, 50 L.Ed.2d 286. Timeliness of objection under the Rule requires that it "be made at the time the evidence is offered . . . ." *DiPaola v. Riddle, supra*, 581 F.2d at 1113; *United States v. Kanovsky*, 618 F.2d 229, 231 (2d Cir.1980). Neither the requirement of specificity nor of timeliness of objection was met in this case and, as Wigmore succinctly puts it, an objection not properly invoked "is *waived*." (Emphasis in text) 1 Wigmore, *Evidence*, § 18, p. 321 (3d ed. 1940).[10]

*United States v. LeBlanc*, 612 F.2d 1012, 1016–17 (6th Cir.1980), *cert. denied*, 449 U.S. 849, 101 S.Ct. 137, 66 L.Ed.2d 60, presents a case singularly like this one. In that case a witness (Belton) had testified on behalf of the Government. He had been severely cross-examined in an effort to impeach his testimony, which implicated the defendant in an armed robbery. In order to corroborate the witness' testimony challenged on the cross-examination, the Government sought to introduce a prior written statement consistent with his at-trial testimony given by the witness to the Government. The defendant objected that the statement was "not an exhibit that has been introduced in evidence yet, and I think for that reason it shouldn't be read by this witness." On the other hand, "[t]he government argue[d] that Belton could properly read the statement as substantive evidence pursuant to Rule 801(d)(1)(B), Federal Rules of Evidence." The trial judge "ruled that [the statement] might be read as a prior consistent statement." The defendant made "[n]o further objection" to the introduction of the statement. Specifically, he did not raise the objection that the prior statement was inadmissible because given after the witness had a motive to fabricate. On appeal, however, he raised this point. He argued that Belton's prior consistent statement was given only after a promise to release his brother for testimony implicating LeBlanc had been given by the prosecution. Therefore, the statement, the defendant urged, was given after Belton had been given a motive to fabricate. In refusing to consider the point because not raised at the time the statement was offered in evidence, the Court said (612 F.2d at 1016):

> "As the record indicates, this argument now made to our Court was not advanced to the trial court at the time the statements were read.
>
> "We conclude that counsel, on behalf of the appellant, did not preserve any right to predicate error on the trial court's ruling for the reason that he did not object to the use of the statements on the ground he now relies upon in this appeal."

This conclusion is equally valid in this case in which no timely objection to the admission on the ground now advanced was made at trial.

---

**10.** For a criticism of this statement of waiver, *see* Wright & Graham, *supra*, § 5033.

But, even if it be assumed that Parodi had objected to the evidence properly, it might be argued that any evidence of a motive to fabricate on Ozella's part was too insubstantial to sustain inadmissibility. The statements made to Ingram by Ozella were not solicited by Ingram. So far as the record indicates, there was no ongoing federal investigation involving Ozella or any of the other defendants in this case at the time. The only prosecution then in progress was the state action, in connection with which Ozella was at the time in custody. Ozella solicited an interview with Ingram, the federal agent; Ingram did not. Ozella did this on the advice of one of his counsel in the state prosecution. At the commencement of his first interview, Ozella inquired of Ingram about a "deal." He was told there could be no promise of leniency or immunity and that, if he wanted to talk, he would have to realize that it was at his full risk. When told this, he inquired of his counsel whether he should talk. His counsel advised him to talk. Such was the preliminary to Ozella's statements. In his statements, Ozella covered completely his extensive involvement in the conspiracy which was the basis of this federal prosecution, as well as his involvement in the state charges which were set for trial a few days later. Ozella did testify during his cross-examination in this trial that he hoped that Ingram would tell the state court at this trial of his cooperation. It was this hope and this mere hope which constituted, according to the defendants' argument, the sole motive to falsify on Ozella's part and which, in Parodi's view, rendered Ingram's testimony in "rehabilitation" of Ozella's credibility under Rule 801(d)(1)(B) inadmissible. It is unnecessary for us to pursue such question, however, since, in our opinion, proof of prior consistent statements of a witness whose testimony has been allegedly impeached may be admitted to corroborate his credibility whether under Rule 801(d)(1)(B), or under traditional federal rules, irrespective of whether there was a motive to fabricate.

We recognize that there is a split in the authorities on this question whether Rule 801(d)(1)(B) conditions admissibility of prior consistent statements corroborative of an allegedly impeached witness' testimony on the absence of a motive to fabricate at the time the prior statements were made. Clearly the Rule itself includes no such limitation upon admissibility for this limited purpose. The Rule itself sets forth but two express conditions for the admissibility of such testimony for this purpose: 1. The prior statement must be "consistent with [the witness' in-court] testimony;" and 2. There must be an "express or implied charge ... of recent fabrication or improper influence or motive" against the witness. If the drafters of the Rule intended any other conditions for admissibility, it must be assumed they would have added them. They did not. A number of circuits, though, have read such a condition into the Rule.

The leading case generally cited as supporting the view that there must be an absence of a motive to fabricate as a condition for the admissibility of such testimony is *United States v. Quinto*, 582 F.2d 224, 234 (2d Cir.1978), in which what was actually involved was the admissibility of prior consistent statements of an impeached witness under Rule 801(d)(1)(B) as substantive evidence. In the course of deciding that issue the Court added language relating to the admissibility of prior consistent statements in rehabilitating an impeached witness, an issue not specially raised in the case. In so doing, it said admissibility in rehabilitation would depend on whether there was a motive to fabricate on the part of the witness at the time the prior statement was given. The rationale, as stated in that decision for this added conclusion, was that the Rule, as drafted, intended no change whatsoever in the prior traditional evidentiary rule for the admission of prior consistent statements whether for the purpose of rehabilitating the testimony of an impeached witness, or as substantive evidence, and that under such traditional rule a condition in both situations was the absence of a motive to fabricate at the time. In stating this rationale, the Court did concede that the Rule

had been intended to enlarge the admissibility of such prior consistent statements "as substantive evidence," but concluded that, while the Rule so extended the use of such evidence beyond the traditional standards of admissibility to allow their use as substantive evidence, the Rule contemplated no departure from what the Court found to have been the traditional more limited rule for admissibility of such statements for corroboration.[11]

There is, however, another line of authorities which finds that neither under the Rule nor under traditional federal law will the existence of a motive to fabricate at the time the prior consistent statement was made render the prior consistent statement inadmissible for the purpose of rehabilitating or supporting the at-trial testimony of a witness whose testimony has been subjected to possible impeachment.[12] *United States v. Parry,* 649 F.2d 292, 296 (5th Cir.1981); *United States v. Scholle,* 553 F.2d 1109, 1121–22 (8th Cir.1977), *cert. denied,* 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300; *United States v. Rios,* 611 F.2d 1335, 1349 (10th Cir.1979), *cert. denied,* 452 U.S. 918, 101 S.Ct. 3054, 69 L.Ed.2d 422 (1981). The construction of Rule 801(d)(1)(B), and of prior federal law under these cases was summarized in *United States v. Parry,* thus:

"The government contends that because Parry's motive for fabricating his story at trial also existed at the time he made the out-of-court statement to his mother, the prior statement lacked probative value and should not have been admitted. This same argument has previously been rejected by the Fifth Circuit. In *United States v. Gandy,* 469 F.2d 1134 (5th Cir.1972), we permitted a party to introduce evidence of a prior statement even though the statement was made after the motive for fabrication had arisen. We specifically followed *Gandy* in *United States v. Williams,* 573 F.2d 284, 289 n. 3 (5th Cir.1978), and we are neither disposed nor authorized to depart from its holding here." (649 F.2d at 296)

We find this second line of authorities more persuasive. As we have seen, there is nothing expressly stated in the Rule itself which supports the view expressed in *Quinto* on the use of prior consistent statements for rehabilitation. As Judge Friendly emphasized in *United States v. Rubin,* 609 F.2d 51, 68–69 (2d Cir.1979, Friendly, J., concurring), *aff'd.,* 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981), *Quinto* itself was concerned only with the application of Rule 801(d)(1)(B) to the use of the prior statements as *affirmative* evidence and it did not present for decision or review the terms of admissibility when such statements are offered for the more limited purpose of *rehabilitation.*[13] Judge Friendly accordingly dismisses the statements in *Quinto* re-

11. The reasoning of the Court is thus summarized:
"... the standards for determining whether prior consistent statements can now be admitted as substantive evidence are precisely the same as the traditional standards and, as explained above, continue to be the standards used under the new rules of evidence for determining which varieties of prior consistent statements can be admitted for the more limited purpose of rehabilitation." 582 F.2d at 233.
*To the same effect is United States v. Guevara,* 598 F.2d 1094 (7th Cir.1979).

12. The author of the Note in 47 ALR Fed. 639 lists the division of the circuits on this point. It was written before either *United States v. Rios, supra,* 611 F.2d 1335, or *United States v. Dominguez,* 604 F.2d 304 (4th Cir.1979), *cert. denied,* 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1980), was decided and in general lists

inaccurately the Fourth Circuit as following *Quinto* in overturning of the Rule.

13. The language of Judge Friendly on this point was:
"Since the only mention of prior consistent statements in the Federal Rules of Evidence is in Rule 801(d)(1)(B) and this limits admission to cases where the statement 'is offered to rebut an express or implied charge against him of recent fabrication or improper influence,' lawyers and judges can be forgiven for being misled into concluding, as was done by dictum in *United States v. Quinto,* ... that the limitation applies to the use of prior consistent statements for rehabilitation as well as for direct evidence. However, analysis makes it clear that Rule 801(d)(1)(B) simply does not deal with the extent to which prior consistent statements may be used for rehabilitation."

stricting the use of prior consistent statements of a witness for rehabilitative purposes under the rubric of the hearsay rule as mere "dictum," contrary to the purposes of Rule 801(d)(1)(B) and of generally approved federal practice. *See* 609 F.2d at 69, particularly note 2. As Judge Friendly put it in note 2 of his concurring opinion, "[a]nyone reading the opinion [in *Quinto*] can readily see that [the admissibility of the prior consistent statement as *substantive* evidence of "the truth of the matter asserted"] was the only issue presented; "nothing in the opinion suggested that questions had been raised whether the memorandum could be used solely for rehabilitation if that issue were to arise on a new trial and the briefs show that none had been." Moreover, Judge Friendly reviewed the federal authorities, particularly of the Second Circuit, prior to the adoption of the new Rules of Evidence and found that, contrary to the assumption in *Quinto,* "the rule generally followed in the federal courts when the Federal Rules of Evidence were being framed" was a flexible one which gave latitude to the trial judge " 'in admitting prior consistent statements for rehabilitation,' " "with an appropriate limiting charge to be given if requested," "quite apart from a claim of recent fabrication." 609 F.2d at 68. Judge Friendly adds that the failure to admit the rehabilitating testimony because of possible motive to fabricate, would be counter to the "great principle of completeness, now enacted in Rule 106" (Fed.R. of Evid.), 609 F.2d at 70. We find this reasoning of Judge Friendly convincing, and we accept it as the proper application both of the Rule in circumstances such as here and of the recognized rule in the federal courts. In so doing we are in effect following Weinstein on *Evidence,* which accepted the reasoning of Judge Friendly as do we, saying that "[s]ince the Rules were designed to expand not contract admissibility, Judge Friendly's approach in *Rubin* seems a more sensitive and useful reading" of the Rule, Weinstein, Vol. 3, 607–96 (1982 rev.).

Actually, even courts which seem to follow *Quinto* such as the Seventh Circuit in *Guevara* have not been entirely consistent in their commitment to the construction placed on the Rule by the dictum in *Quinto.* Thus, in *United States v. Baron,* 602 F.2d 1248 (7th Cir.1979), decided by the Seventh Circuit subsequent to *Guevara,* the defendant had, as here, severely cross-examined the witness on inconsistencies between prior statements made by the witness in memoranda kept by him relating to certain criminal payments made by the defendant and his trial testimony. In rebuttal, the Government sought to offer the memoranda. The defendant objected, claiming, on the basis of *United States v. Quinto,* 582 F.2d 224, that the memoranda were inadmissible under Rule 801(d)(1)(B). The district judge dismissed the objection, saying (602 F.2d at 1251):

> "It seems to me that what you [the defendant] are trying to do is have your cake and eat it too. That is, use the statement solely to show that on the earlier occasion he had some differences in his recollection, as distinguished from what his testimony was, but that it is not permissible for the Government to show that at the same time his recollection at the earlier date was consistent with his testimony here."

The Court of Appeals "agree[d] with the trial judge that in these circumstances it would have been unfair and extremely confusing to the jury not to admit the memoranda." It found that "*Quinto* would not in any event control this case because of many factual differences. *Importantly, the defendant in Quinto had made no attempt to use the memoranda for impeachment of the prosecution's witnesses.* The fact question of whether the motive to falsify existed at the time the memoranda were prepared may well be one for the jury, and here the defense vigorously presented its fabrication theory throughout the trial." (Emphasis added) 602 F.2d at 1252–53. It will be noted that the Court made the same distinction in connection with *Quinto* as had Judge Friendly in *Rubin.* We see no substantial difference in principle from the ruling made in this case by the district judge and that here, especially since Ozella had been cross-

examined by Parodi's counsel on what he had told Ingram in his interviews. *See also, United States v. Nardi,* 633 F.2d 972, 976 (1st Cir.1980).

Again in *United States v. Sampol,* 636 F.2d 621 (D.C.Cir.1980), the Court, though seeming to recognize that many authorities deny admissibility of the prior consistent statement given after a motive to fabricate, found special reasons not to apply such restriction on the admissibility of such evidence in that case. One of these reasons for such conclusion, as stated by the Court, was that, in his prior statements, the impeached witness had made extensive "admissions of his own culpability." These admissions, the Court found, gave sufficient indicia of reliability to warrant the admission of the prior consistent statements. 636 F.2d at 672–73. Like considerations of reliability are present in this case. At the time Ozella commenced his conversations with Ingram, he had not been indicted for any federal violation. By his statements to Ingram, freely and voluntarily given, he admitted his extensive involvement and guilt both in the pending state prosecution and in the violations embraced in this federal prosecution. Such admissions against penal interest, given after being denied a "deal" or any semblance of a promise of immunity, would, under *Sampol,* give such probative value and reliability to Ozella's statements as would, even under the *Quinto* dictum, render them admissible.

It is Parodi's position, however, that *United States v. Weil,* 561 F.2d 1109 (4th Cir.1977) commits this Circuit to the strict and rigorous construction of the Rule as enunciated in the dictum in *Quinto* without even the flexibility accepted in *Baron* or *Sampol.* We do not so read *Weil.* In that case, the objection to the admissibility of the prior consistent statement was based on the fact that such statement was being offered in rebuttal "without the witness' testimony having been impeached." That manifestly was a sound objection under the Rule to the admission of the statement; the defendant's problem, however, was that, when first offered, such statement was not objected to. The Court properly found that this failure to object waived the objection both to the evidence when first introduced and when later reoffered. *United States v. Dominguez,* 604 F.2d 304 (4th Cir.1979) is more nearly in point on the issues here than *Weil.* There, one Bailey "agreed to cooperate with the [Customs] Service in order to obtain a reward for capture of the smugglers." At trial he testified as a witness for the Government. Bailey's testimony was impeached. Such impeachment "was rife with implications that [Bailey's] testimony was improperly motivated." The Government sought to "rehabilitate" Bailey's credibility by the testimony of an officer of the Customs Service of prior consistent statements made to him by Bailey "during the course of Bailey's undercover work on the case." The defendant objected relying on *Weil.* It is obvious that Bailey's motive to fabricate was as clear and definite as that of the IRS agents in *Quinto* and of the "paid informant" in *Guevara.* We, however, found the testimony admissible under Rule 801(d)(1)(B) and, in so doing, found no conflict with *Weil.* Similarly, we find that in admitting for the limited purpose of rehabilitation the prior consistent statements of the witness Ozella the district judge in this case did not commit reversible error.

Finally, Parodi complains of error in the refusal of his motion for a directed verdict for insufficiency of evidence. It is conceded by the Government that its case against Parodi is largely circumstantial, consisting as it does of a number of incidents patched together, all confirming relationships between Early and Parodi involving cocaine trafficking. Of course, Parodi, in his testimony, would give all these incidents a perfectly innocent character. While not denying a close and intimate relationship with Early, he would paint such relationship as one based on innocuous common interests in various recreational pursuits such as tennis and motorcycling and in their Hispanic background. Even though the record abundantly establishes Early's heavy involvement as a drug dealer (in fact, he seems to have had no other avocation), Parodi disclaims any knowledge whatsoever that his

intimate friend was involved in drugs. The witness Ozella who was involved as a courier in Early's drug operations, however, gives in his testimony an entirely different character to the relationship between Early and Parodi. His testimony, under the Government's theory, points to Parodi as the source for Early's drug operations sufficiently to make such issue plainly one for jury resolution. We summarize briefly certain relevant parts of Ozella's testimony which justify this conclusion.

We begin with Ozella's testimony with respect to an occasion when Early was caught in a serious "money bind" in his drug operations. He apparently owed a substantial sum to his supplier. This supplier, by Early's statement to Ozella, was putting great pressure on him for payment. Early was very upset and sought hastily to gather in funds to satisfy the demands of his supplier. He dispatched Ozella to Montana to pick up collections due on Canadian drug deliveries. As instructed Ozella collected $120,000 in Canadian funds and returned with these funds to Miami where he made delivery to Early at the latter's home. Ozella then accompanied Early to meet another courier at the airport bringing $30,000 from New York. As soon as Early and his two couriers returned to his house from the airport, there was a telephone call for Early. Shortly thereafter Parodi arrived, accompanied by a companion. Parodi and Early withdrew into a bedroom. In a few moments they emerged and Parodi left. Early, obviously considerably agitated, explained to Ozella that he "owed them some money" which apparently he had paid them and that "he (Early) couldn't understand why they were upset" over the "money." Sometime later Parodi returned to the house and at this time inquired of Ozella what had taken him so long. Ozella reasonably assumed this inquiry related to his trip to get the money in Montana and he answered that he had come as fast as he could. Of course, the Government contends that this evidence points inescapably to Parodi as the one Early was paying as his drug supplier.

There were several other circumstances that reinforce the inference that Parodi was Early's supplier and thereby the ultimate supplier of Early's customers listed in the conspiracy. On two occasions Early took Ozella with him to pick up some cocaine from his supplier. On both occasions they went to the Bricknell Apartments or Condominiums in Miami where Parodi lived. Neither time did Ozella go into the Apartments with Early; he remained in the car outside. After a few minutes Early returned on each occasion with cocaine. On one of these visits Ozella did not see Parodi but on the second visit he did see Parodi outside the apartment. Ozella had brought back some money from Montana and Early had this money with him when he and Ozella went to the Bricknell Apartments on this occasion. Early met Parodi outside the Apartments, apparently by pre-arrangement, and the two of them went into the apartment building together. In a few minutes Early returned alone without the money but with cocaine.

Ozella testified to another time when Early sent him to make a delivery of cocaine to a customer in Ft. Lauderdale. The customer refused to accept the cocaine as "too flaky." Ozella returned to Early's house in Miami with the rejected cocaine. Early was not at home. Ozella went to a stand where there were public telephone booths often used by Early, which was a common practice for drug dealers seeking to foil possible telephone taps. He found Parodi and Early there together. He was introduced to Parodi by Early. He proceeded to tell the two of them of the rejection of the cocaine by the customer. Parodi and Early began to talk in Spanish and Ozella assumed with reason they were talking about the rejected cocaine. When they finished talking, Early told Ozella, "we'll get something else then." If this evidence is to be believed, both Parodi and Early had a common interest in the rejected cocaine and it is reasonable to assume that Parodi was the supplier who had sold the rejected cocaine to Early.

Among Early's substantial customers were the defendant Conway and a Mrs.

Kelly, both of whom lived in the Boone area of North Carolina. Ozella accompanied Early on a visit to Boone to arrange dealings with Conway and Kelly. The two of them registered at The Holiday Inn in Boone. A message was received in their box to call "Carlos." "Carlos" was Parodi's first name. Ozella gave the message to Early, who responded to the call. The hotel telephone records show that there were calls between Early's and Ozella's room and the telephone in Parodi's apartment at this time. The Government would find in this evidence of Parodi's constant interest in Early's drug operations.

Ozella testified to two visits by Parodi to Early's house on June 18, 1980. Ozella had spent the night at Early's house. Early left in the morning, leaving Ozella alone in the house. Before leaving, however, he gave Ozella $2,000 with instructions to deliver it to Parodi when the latter called. In a short time Parodi called. Ozella told him that he had the $2,000 for him. Parodi showed up promptly with a companion, another "Carlos." After Ozella had given him the money, he told Ozella to tell Early that he was "flying to Bimini to look at a thousand pounds of marijuana and kilos of cocaine that [had] been confiscated . . . ." While all this was occurring, Parodi's companion was on the telephone attempting to secure a plane. Parodi's passport showed that he did go to Bimini that day. Early thereafter returned to the house with Conway. Presumably Ozella gave him Parodi's message. Early left, leaving this time Conway and Ozella at the house. Sometime afterwards Early returned with a supply of cocaine. He immediately began to arrange in a bedroom a "hot set" in order to test the quality of the cocaine. He did not begin to test until after Parodi had arrived. Early conducted the test with Parodi looking on. During the test Parodi and Early engaged in a conversation, presumably about the test, in Spanish. After the test was concluded, Parodi left. It is, of course, the Government's position that the two visits on June 18 were related. It is inferable according to the Court that Ozella had passed on to Early Parodi's message that he (Parodi) was flying to Bimini to procure cocaine and that Early, on hearing this, saw Parodi on the latter's return from Bimini and acquired from him cocaine purchased by the latter in Bimini. Early, however, had had a bad experience with the cocaine Ozella had delivered to the customer in Ft. Lauderdale, Florida, and he wished to test this cocaine before finally accepting it. Early accordingly took the cocaine to his house to test. Parodi as the supplier was advised of this; and Parodi, because of his interest as the supplier, asked to be present and was present at the test. Whether all this was reasonably inferable from the circumstances the Government urged was a jury issue.

Finally, when Ozella was arrested in North Carolina, Parodi and Early secured a lawyer for him without any request from Ozella and that attorney was paid a large fee to defend Ozella in what appeared to be a case where Ozella's chances of a successful defense were remote. Incidentally, the fee paid for defending Ozella in this case was approximately three times the fee paid by Parodi to his attorney for his defense in this case, according to Parodi's testimony. Parodi claimed he merely introduced Early to Rubino, the lawyer employed to represent Ozella and did not participate in the actual employment of Rubino. It is, however, unusual that, in order to secure a lawyer for one of his subordinates, Early went to Parodi and that Parodi took him to his lawyer, who, by Parodi's testimony, was an outstanding criminal lawyer in the Miami area.

Taking all this evidence together—Parodi's ubiquitousness in so much of Early's drug operations, the signs pointing to him as the supplier, his clear identification as the person to whom large payments were made for what was unquestionable cocaine sales—a sufficient pattern of participation on Parodi's part was established to sustain the district judge's action in refusing Parodi's motion for a directed verdict of acquittal. It is true that Parodi disputed or contradicted parts of Ozella's incriminating testimony but it is important that in many particulars, some of special

significance, he confirmed Ozella's testimony. After all, conflicts of credibility between witnesses are matters for the jury. The test for the sufficiency of evidence on a motion for acquittal is whether, viewing the evidence in the light most favorable to the Government, a reasonable man might find the evidence inconsistent with every reasonable hypothesis of innocence. *Burks v. United States,* 437 U.S. 1, 16–17, 98 S.Ct. 2141, 2149–50, 57 L.Ed.2d 1 (1978); *United States v. Navar,* 611 F.2d 1156, 1157–58 (5th Cir.1980). So tested, the evidence in this case against Parodi was sufficient to withstand his motion for acquittal.

Having disposed of Parodi's individual claims of error, we proceed now to the individual claims of the other two appellants.

## III

■ The defendant Conway particularly complains of testimony of meetings between him and Turner, as well as the admission of a photograph of him, taken with Turner. Conway identifies Turner as a "known fugitive" and asserts Turner was not involved in the conspiracy charged in the indictment. The testimony admitted by the district judge linking him to Turner, Conway says, represented an attempt to prove character in violation of Rule 404(b), Fed.R. of Evid. Conway, Turner and others in North Carolina originally agreed to a common enterprise for importing by plane marijuana from Mexico. Turner was actively involved in acquiring a plane for this purpose. There was some delay and the parties, including Conway and Turner, turned to using the plane to import cocaine into North Carolina from Miami. The group's source for cocaine in Miami was Early. Whatever may have been the original intentions of the parties, the evidence is abundant that Turner had participated in the activity of transporting cocaine, purchased from Early, into the North Carolina area. There was no error in admitting testimony of the transactions between Turner and Conway.

■ Equally without merit is Conway's second claim, which would find a fatal inconsistency between his conviction under a charge of an overt act pursuant to the conspiracy, which was similar to one under which the jury acquitted the defendant Crump. Inconsistencies in verdicts against multiple defendants, if supported by adequate evidence, is not a ground for reversal. *United States v. Godel,* 361 F.2d 21, 24 (4th Cir.1966). There can be no question that there was ample evidence to support Conway's conviction under the counts charging overt acts on his part in pursuance of the conspiracy.[14]

## IV

■ The defendant Laws would find error in the admission of a tape recording of telephone conversations allegedly between him and one Vance. These telephone conversations were identified by Vance in his testimony. It is Laws' position, though, that Vance had never met or seen Laws and was therefore not a proper witness to identify him (Laws) as the other party to the conversations recorded on the tape. This argument approaches the frivolous. The Government's testimony was clearly sufficient to identify Laws as a participant in the telephone conversations. Indeed, Laws in his own defense admitted without question his participation. When asked specifically about the conversations on the tapes, Laws responded directly, "I said what was on the tapes." There was no error in the admission of relevant taped conversations, the accuracy of which the defendant Laws himself later admitted in his direct testimony.

In conclusion, having found no merit in any of the claims of error, all the convictions herein are

AFFIRMED.

14. Conway also joined in Parodi's objection to the admission of Ingram's testimony of prior consistent statements made by Ozella. What was said about this objection as made by Parodi sufficiently disposes of this contention and need not be repeated.