Charles Sylvester STAMPER,
Petitioner–Appellant,

v.

Raymond A. MUNCIE, Warden,
Virginia State Penitentiary,
Respondent–Appellee.

No. 90–4008.

United States Court of Appeals,
Fourth Circuit.

Argued April 9, 1991.

Decided Aug. 19, 1991.

As Amended Sept. 12, 1991.

Dennis William Dohnal, argued (John E. Lichtenstein, on brief), Bremner, Baber and Janus, Richmond, Va., for petitioner-appellant.

Thomas Drummond Bagwell, Sr. Asst. Atty. Gen., argued (Mary Sue Terry, Atty. Gen. of Virginia, on brief), Richmond, Va., for respondent-appellee.

Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and BUTZNER, Senior Circuit Judge.

## OPINION

MURNAGHAN, Circuit Judge:

Charles Sylvester Stamper was tried and convicted on three counts of capital murder and four associated felony counts in Henrico County, Virginia on November 17, 1978. He was sentenced to death on each of the capital murder convictions and to a term of life imprisonment plus three years on the other charges.

Upon automatic appeal to the Virginia Supreme Court, the conviction and the imposition of the death penalty were affirmed. Subsequently, the United States Supreme Court denied Stamper's petition for a writ of *certiorari*.

There then began a series of petitions for writs of *habeas corpus* before the state and federal courts, in which the Fourth Circuit Court of Appeals twice remanded the case for failure to exhaust state remedies. On May 3, 1988, ten years after the trial, the Virginia Supreme Court denied the appeal of Stamper's fully-litigated petition for a writ of *habeas corpus* in the state courts.

Thereafter, Stamper filed a petition for a writ of *habeas corpus* in the United States District Court for the Eastern District of Virginia. The district court denied the writ on November 5, 1990 and from such denial arises the instant appeal.

### I.

On March 25, 1978, a Saturday, at approximately 6:35 a.m., Richard Wren, a breakfast cook at Shoney's Restaurant in Henrico County, discovered the bodies of Steven Staples, Agnes Hicks, and Franklin Cooley. The door to Shoney's was broken from the inside out. Wren crawled through the broken door to the inside of the restaurant and discovered the bodies. Cooley was still alive, but died several hours later without regaining consciousness. Wren also observed that the safe was open. The medical evidence revealed that the deaths had occurred at 6:00 a.m. (except that of Cooley who died several hours later). Steven Staples, the Assistant Manager, died of gunshot wounds to the chest from a .22 caliber copper jacketed bullet made by Winchester Western. The bullet had entered Staples' chest from above the collarbone and traveled downward from front to rear. Powder burns on Staples' chin and right wrist indicated that the weapon had been fired only inches from him. Staples' skull had been fractured by a heavy rectangular object, possibly from an angle iron found near his body. Additionally, there was a cut along the right side of Staples' neck caused by a sharp-edged weapon.

Franklin Cooley, the night janitor, died of gunshot wounds to the head. Powder

burns indicated that the weapon had been fired at close range. Cooley was killed with a .22 caliber copper clad bullet manufactured by Winchester Western.

Agnes Hicks, also an employee of Shoney's, was killed by two shots from a .22 caliber weapon. One bullet was copper clad and the other was plain lead. Plain lead bullets are manufactured by Remington.

Shoney's Restaurant did not open until 7:00 a.m. and only employees were allowed inside prior to opening. Stamper did not have a key to Shoney's. All locks on the doors had been changed with the advent of new management, and of those murdered, only Staples had the combination to the safe or a key to the door. The restaurant has a fire exit which can be opened from the inside, but an alarm sounds and one must have a key to turn the alarm off. All Shoney's employees knew about the fire door. The safe had been locked the night before the crime and had contained about $4500. Michael Gambill, an Assistant Manager at the time of the murders, checked the safe on the morning of the killings, March 25, 1978, about 1:00 a.m. At the time, Cooley was present cleaning. An audit conducted after the crime revealed that $3,983.77 was missing from the safe.

Stamper was employed as a cook at Shoney's. He worked Monday through Friday from 6:30 a.m. to 2:00 p.m. Staples was Stamper's manager. Stamper had not been scheduled to work on the day of the murders unless another cook did not report for work. Stamper had worked at Shoney's for a couple of months and had made $3.00 per hour. Stamper had told Janice Gaberdiel, a manager at Shoney's, however, that he was quitting because he needed more money. Stamper gave his notice to Gaberdiel a week before March 25, 1978. Although scheduled to work on the Monday and Tuesday after the killings, Stamper did not appear for work until Wednesday.

Witnesses in the area of Shoney's on the day and time in question testified that a car fairly resembling Stamper's had been in the parking lot off Hilliard Road at approximately 5:40 to 5:50 a.m. and that a car resembling Stamper's had come out of the parking lot beside Dumbarton Square at about 5:50 a.m. As an employee, Stamper was supposed to park his vehicle in the parking lot on the Hilliard Road side of Shoney's.

Henrico County police investigated the robbery and murders. Numerous photographs were taken, as was a black and white video tape of the crime scene, and were all introduced into evidence.

As part of its investigation, the Henrico County police interviewed employees of Shoney's, and stopped Stamper at approximately 9:45 p.m., March 25th, on Dill Road. Earlier that day, Stamper's car had been parked in the driveway of his parents' home at 2213 Cleary Road. Stamper was not a suspect at that time and agreed to go to police headquarters for an interview. During the interview at police headquarters, Stamper's car was locked. Stamper stated that no one else had access to the car that weekend. After a policeman peering into the car noticed some glass particles on the floor board, the police asked Stamper if they could search the car. Stamper consented. The glass particles were recovered from the front floorboard. Stamper told the police that he had last been at Shoney's at 3:00 p.m., March 24, 1978. Stamper's alibi was that he had gone out to a social on the night of March 24, and that he and his wife had watched TV late on March 24 through March 25.

It was stipulated that the glass comprising the samples from Stamper's car was substantially identical in various optical properties with the glass analyzed by Eugene Reichenbecher, a glass analyst. Tests revealed that of the 36 particles of glass found in Stamper's car, 20% matched, in optical properties, the glass at Shoney's. The glass from the window at Shoney's was comparable with only 4% to 5% of other glass made.

The keys to Staples' automobile were found in the woods near Stamper's parents' home. (Stamper had lived with his parents up until a short time prior to his moving to Menole Avenue.) A .22 caliber pistol was also found in the same area.

Cecil Moorehead, a ballistics expert, testified that the .22 caliber pistol found near Stamper's parents' home had four empty cartridge casings, four live cartridges and one empty cylinder. The cartridges which had been fired consisted of three Winchester Western (copper clad) and one Remington (plain lead) cartridges. Those live cartridges remaining in the pistol consisted of two Winchester Western and two Remington. Moorehead explained the order of firing of the cartridges by the rotation of the cylinder: Winchester Western, Winchester Western, Remington, Winchester Western. The pistol examined by Moorehead was consistent with that of the murder weapon as to pistol type, the bullets fired, and the lands and grooves of the rifling. However, Moorehead could not definitely say that the pistol was the murder weapon because the bore had been pitted by rust, making accurate comparison impossible.

Stamper lived with his wife in the Laburnum Apartments on Menole Avenue, about an eight to ten minute drive from Stamper's parents' residence on Cleary Road. Stamper was behind in his March 1978 rent ($100 per month) and had received a pay or quit notice. Stamper paid his rent on March 30. On March 8, 1978, Stamper owed Stonestreet Jewelers $63.55, and a civil judgment had been obtained therefor. Stamper paid all but $5.50 on the debt on April 5, 1978. On April 8, Stamper paid the remaining $5.50, paid $100 as down payment on a $180 watch, and co-signed a note for a friend in the amount of $395.

On March 27 or 28, 1978, Stamper visited a car dealer on Hilliard Road and discussed the purchase of a 1972 Lincoln, priced at $3500. Stamper indicated that he had $1500 in his pocket to put as down payment on the car.

Tried on three counts of capital murder, one count of robbery, and three counts of use of a firearm, Stamper was convicted in the Circuit Court of Henrico County on November 17, 1978. He was sentenced to death on each of the capital murder charges, life on the robbery charge, and one year each on the use of a firearm.

Stamper's automatic appeal of his conviction was heard by the Virginia Supreme Court. His convictions were affirmed. *Stamper v. Commonwealth,* 220 Va. 260, 257 S.E.2d 808 (1979). *Certiorari* was denied by the Supreme Court. *Stamper v. Virginia,* 445 U.S. 972, 100 S.Ct. 1666, 64 L.Ed.2d 249 (1980).

Stamper filed his first petition for a writ of *habeas corpus* in the Circuit Court of Henrico County, which was denied by an order dated December 4, 1980. The Virginia Supreme Court affirmed that decision by an order dated November 20, 1981. Thereafter, Stamper filed a petition for a writ of *habeas corpus* in the United States District Court for the Eastern District of Virginia. A plenary hearing was conducted, and the petition was dismissed on February 12, 1982. *Stamper v. Baskerville,* 531 F.Supp. 1122 (E.D.Va.1982). Stamper appealed.

On October 4, 1982, we found that Stamper had failed to exhaust state remedies and ordered that the appeal be dismissed. The Commonwealth petitioned for *certiorari* in the United States Supreme Court, which was denied on February 22, 1983. *Baskerville v. Stamper,* 459 U.S. 1225, 103 S.Ct. 1231, 75 L.Ed.2d 466 (1983).

On remand to the United States District Court, the Commonwealth waived the exhaustion requirement, and the waiver was accepted. The district court then dismissed the petition on its merits. *Stamper v. Baskerville,* 558 F.Supp. 100 (E.D.Va.1983). Stamper appealed that ruling to the Fourth Circuit which again remanded the case to the district court for dismissal for failure to exhaust state remedies. *Stamper v. Baskerville,* 724 F.2d 1106 (4th Cir.1984). On February 6, 1984, the district court dismissed the petition for failure to exhaust state remedies.

Thereafter, petitioner filed still another petition for a writ of *habeas corpus* in the Circuit Court of Henrico County. A plenary hearing was held in that court on September 6, 1984, and the petition was denied by an order dated December 28, 1984. Stamper appealed that decision to the Virginia Court of Appeals which affirmed the

judgment of the Circuit Court. *Stamper v. Townley*, 4 Va.App. 101, 354 S.E.2d 802 (1987). Petitioner thereafter appealed to the Virginia Supreme Court which denied the appeal by an order dated May 3, 1988.

Stamper subsequently filed a petition for a writ of *habeas corpus* in the United States District Court for the Eastern District of Virginia, which was denied November 5, 1990 and is presently before us on appeal.

## II.

■ Stamper's first assertion of error is that the evidence adduced at trial—all of it circumstantial—was insufficient as a matter of law for any rational trier of fact to find guilt beyond a reasonable doubt or to conclude that he was the "trigger man" as required under Virginia law for imposition of the death penalty. Va.Code Ann. § 18.2–31.4, .7.

Yet the authorities provide well-settled principles to the effect that circumstantial evidence is no less probative than direct evidence, *United States v. DeCorte*, 851 F.2d 948, 954 (7th Cir.1988); that "circumstantial evidence required to support a verdict need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities save guilt," *United States v. Gay*, 774 F.2d 368, 373 (10th Cir.1985); and finally, that "'[c]ircumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof.'" *United States v. Richardson*, 848 F.2d 509, 514 (5th Cir.1988) (*quoting Coggeshall v. United States* (The Slavers), 69 U.S. (2 Wall.) 383, 17 L.Ed. 911 (1865)).

Turning, then, from the character of the evidence to the evidence itself, the following facts were established at trial:

1. Stamper was employed as a cook at the restaurant where the murders took place. He was not scheduled to work on the Saturday the crime was committed unless one of the other cooks failed to come to work.

2. The murders took place before the restaurant opened. Stamper did not have a key to the restaurant. The front door to the restaurant was broken from the inside out. The back door was a fire exit containing an alarm which would sound if the door was opened. Twenty percent of the glass shards recovered from Stamper's car were found to match, in optical properties, the glass broken out of the restaurant's front door. The expert who examined the glass could not, however, say with certainty that the glass found in the car was the same glass contained in the door because of the limited number of tests the small size of the samples allowed him to run.

3. The three people murdered were all employees of the restaurant but only victim Staples knew the combination to the safe. The person who discovered the victims found that the safe was open. The safe had been locked the night before and had contained about $4500. An audit conducted after the crime revealed that $3,983.77 was missing.

4. Victim Staples was shot once. The bullet was a .22 caliber copper jacketed round made by Winchester Western. Victim Cooley was also shot once, killed by the same type of bullet. Victim Hicks was killed by two shots from a .22 caliber weapon. One bullet was a copper jacketed Winchester Western and the other was a lead Remington. A .22 caliber pistol was recovered from the woods near Stamper's parents' home. Stamper had lived with his parents prior to moving to an apartment with his wife, and his car had been seen in his parents' driveway on the day of the murders. The weapon contained four empty cartridge casings, four live rounds, and one empty cylinder. The cartridges fired consisted of three Winchester Western (copper jacketed rounds) and one Remington (lead) round. The ballistic expert who had examined the gun testified that the bullets fired were consistent with the recovered pistol as to rifling, lands, and grooves, but could not conclude that the pistol was in fact the murder weapon because of the rusted condition of the

bore and the mutilated condition of the bullets fired.

5. Two witnesses testified to seeing a car fairly resembling Stamper's car in, and later coming out of, the restaurant parking lot.

6. The keys to victim Staples' car were recovered from the woods near the home of Stamper's parents.

7. Stamper was behind on his March 1978 rent and had received a pay or quit notice. In the fifteen months he had lived at the apartment, he had never paid the rent on time and had received such notices on six other occasions. Stamper paid the $100 on March 30. As of March 8, 1978, Stamper owed a jeweler $63.55 and faced a judgment against him in that amount. Stamper paid all but $5.50 of the debt on April 5. On April 8, he paid the balance, paid $100 as down payment on a $187 watch, and co-signed a note for a friend in the amount of $395. Stamper had been a regular lay-away customer of the jeweler since March 1977. On March 27 or 28, Stamper went to car dealership and discussed the purchase of a 1972 Lincoln priced at $3500, claiming that he had $1500 in cash for the down payment in his pocket. The dealer never actually saw the money and Stamper never purchased the car.

8. Nineteen fingerprints and a footprint were recovered from the crime scene. None were Stamper's.

9. Stamper told the police that he had been to a social with his wife on the night before the crime was committed, had stayed up late with his wife watching TV, and was asleep with his wife on the morning of the murders. His wife corroborated his account on the stand.

10. Stamper did not show up for work as scheduled on Monday or Tuesday, March 27 and 28, but returned to work on Wednesday the 29th.

The inferences the Commonwealth asked the jury to draw from such facts are fairly obvious. Only an employee could have gained access to the restaurant before it opened on the morning of March 25. The fact that the glass in the front door was broken from the inside out suggests that the victims let Stamper into the restaurant because they knew him, and then locked the door behind him. In his haste to escape, Stamper grabbed Staples' car keys instead of the restaurant keys, could not unlock the door, and then broke through the front door, knowing that escape through the fire exit would set off an alarm. Stamper then threw the keys and the gun into the woods near his parent's home. Stamper's motive for the robbery was his indebtedness.

Only an employee would have known that the safe contained money and that one person who knew the combination to the safe would be present that morning. Only an employee would have murdered all of the witnesses to the crime because they all knew him.

Of course, such are not the only inferences to be drawn from the facts here recited. Stamper's attack on the sufficiency of the evidence is chiefly directed at the inferences the Commonwealth chose to draw therefrom. Because one or more other, nonincriminating inferences might be drawn, Stamper contends that it was unreasonable of the jury to accept the inferences suggested by the prosecution. He goes so far as to suggest that an inference may only qualify as a "logical" inference when no other inference fairly may be drawn from the same set of facts. But in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court ruled that the prosecution is not required to negate every hypothesis except that of guilt. Thus,

the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as

weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

*Id.* at 319, 99 S.Ct. at 2789 (emphasis in original) (citation omitted). A consideration of the evidence under the *Jackson* standard leads to no other conclusion than that the evidence presented sufficiently supports inferences upon which a rational trier of fact could render a verdict of guilt beyond a reasonable doubt.

■ Next Stamper has attacked the competency of his trial counsel by claiming that counsel failed to raise timely objections to the trial court's striking of four prospective jurors for cause because of the prospective jurors' responses to questions concerning the death penalty. It is Stamper's contention that trial counsel's and the court's questioning of the four prospective jurors and counsel's failure to rehabilitate them fell short of satisfying the standard for excusing jurors on the basis of their opposition to the death penalty set forth in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

■ Under *Witherspoon*, prospective jurors cannot be excused from jury service on the ground of their opposition to the death penalty unless such jurors make it

unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

*Id.* at 522–23 n. 21, 88 S.Ct. at 1777 n. 21 (emphasis in original).[1] Applying the standard in the context of proper voir dire, Stamper has urged that "a prerequisite to competent trial representation is the mak-

ing of timely objections to the striking of jurors for cause when the *Witherspoon*" standard has not fully been made out. We must thus decide, under a two-prong analysis, first, if such failure constituted, "in light of all the circumstances ... acts or omissions ... outside the wide range of professionally competent assistance," *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984); and second, whether "deficiencies in counsel's performance [were] prejudicial to the defense." *Id.* at 692, 104 S.Ct. at 2067.

A review of the record indicates that, when asked whether he was "absolutely committed against imposing the death penalty in any case," juror Banks replied, "Under no circumstances, no matter what the penalty is, could I in any way vote to take another person's life and then live with myself afterwards." Juror Harper responded similarly. That satisfied the first *Witherspoon* standard; that it was "unmistakably clear ... that [the juror] would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before [him]." 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21. Stamper also seems to suggest that both of the standards set out in *Witherspoon* must be explored at voir dire, yet the test set out is in the disjunctive; meeting either standard alone is sufficient to excuse the juror.[2]

Prospective jurors Chenault and Shearn were asked if they agreed with Banks. Stamper contends that they never answered. The record indicates that they did something, whether nodding in agreement or otherwise, to lead the trial judge to excuse them. And later, although the court had already excused Banks, Chenault, Shearn, and Harper, defense counsel recalled them and asked each that, if ten

---

1. The Supreme Court later revised the *Witherspoon* standard in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), ruling that the test for exclusion is whether the prospective jurors' feelings concerning capital punishment would "substantially impair" their ability to render a fair and impartial verdict.

2. Banks' and Harper's responses also satisfy the less stringent test in *Witt,* leaving little doubt that their feelings toward the death penalty would "substantially impair" their ability to render an impartial verdict.

people witnessed the malicious, terrible murder of a small child, could each, in such a case, where the evidence is strong, vote for the death penalty. Each juror stated that he or she could not. Thus, even though the questions were posed after the prospective jurors had been excused, their later responses demonstrate that Stamper suffered no prejudice caused by their dismissal sufficient to satisfy the second prong of *Strickland.*

■ Stamper's second line of attack on competency of counsel at voir dire concerns counsel's alleged failure properly to explore with certain members of the venire the "reverse *Witherspoon*" inquiry; that is, whether certain jurors were predisposed to automatic *imposition* of the death penalty once a defendant is found guilty of murder.[3]

In a case decided three years after Stamper's trial, *Patterson v. Commonwealth,* 222 Va. 653, 283 S.E.2d 212 (1981), the Virginia Supreme Court appeared to recognize the validity of the "reverse *Witherspoon*" inquiry, ruling that "the process of selection of an impartial jury permits elimination for cause of those veniremen who are biased in favor of the death penalty under all circumstances as well as those who are biased against its imposition under all circumstances." *Id.* at 659, 283 S.E.2d at 216. The flaw in Stamper's line of argument in citing *Patterson* is that he seems to be equating a prodeath-penalty disposition with a proclivity for *automatic* imposition of the penalty in all circumstances, while Virginia law appears to draw a more careful distinction. *See e.g., LeVasseur v. Commonwealth,* 225 Va. 564, 578, 304 S.E.2d 644, 654 (1983), *cert. denied,* 464 U.S. 1063, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984) (trial court excused juror without waiting for formal challenge when juror stated that "if capital murder were proved, he would *automatically* vote to impose the death penalty"). Nothing said by any of the jurors supports or indeed suggests such equivalence.

Questions of the rigor of trial counsel's voir dire aside, Stamper fails utterly to demonstrate how any shortcoming on trial counsel's part constituted prejudice sufficient to satisfy the second prong of the *Strickland* test, other than to state in conclusory fashion that trial counsel's "deficient performance under the first 'prong' of *Strickland* ... constituted an inherent prejudice that tainted both the guilt and punishment phases of the proceedings such that the second and final test of *Strickland* was also met." Yet cases such as *Patterson* and *LeVasseur* do not support so bold an assertion. And the fact that the jury did not return findings of death by aggravated battery on two of the victims, its careful distinction between them in the verdict, demonstrates that the jury was not disposed automatically to impose the death penalty but carefully followed instead the court's instructions.

■ In his third assertion of error, Stamper again challenges the competency of trial counsel for counsel's acquiescence in the submission of a response by the trial court to a juror's question. Stamper contends that the response negated the very theory of defense trial counsel had sought to prove—namely, that someone else, "another pair of hands," had committed the murders—and negated the significance of the lack of evidence of fingerprints or footprints in placing Stamper at the scene of the crime.

At the close of the evidence, one juror submitted the following question, among others, to the court, outside the presence of the other jurors: "[H]ave there been any additional arrests of a possible accomplice in the crime?" The question ultimately led to the submission of the following response to the entire jury:

> One question related to whether or not there was more than one person involved in this affair. That is really irrelevant to the issue of guilt of this defendant. The issue here is was this defendant involved. If the jury thinks more than one was or

---

**3.** Although Stamper's brief does not mention the jurors by name, jurors Kimberly, Ulmer, and Ball, when asked by the court whether they had any reservations concerning the death penalty replied by stating, "I have no reservations," or in Ball's case, "I'm for capital punishment."

if the jury thinks only one was, that's—the jury may think as they see fit from this evidence, but the issue before this jury with respect to this defendant is was he personally involved?

In addition, Stamper urges that trial defense counsel exacerbated the error by strenuously objecting to the initial response proposed by the court that "similar charges are pending against another defendant," when in fact such a response would have bolstered the defense's theory that some other person had actually committed the crimes. Stamper contends that such an "error" cannot be justified on the basis of strategy or tactics.

Here we must ask "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2068–69.

Stamper's logic is difficult to follow or accept. His theory of defense, simply stated, has been that he was not at the scene of the crime, as demonstrated by the presence of fingerprints and a footprint which were not his.[4] Apparently, the prosecution favored the court's proposed initial response—"similar charges are pending against another defendant"—in order to weaken the import of the nonmatching fingerprints and footprint by demonstrating the existence of an accomplice. Defense counsel successfully prevented such weakening by preventing any suggestion of the existence of an accomplice from reaching the jury. Those tactics were reasonable. *See Strickland*, 466 U.S. at 690, 104 S.Ct. at 2065. Stamper's recasting of the pros and cons of trial counsel's decision amounts to Monday morning quarterbacking.

Moreover, returning again to *Strickland's* second prong—prejudice—the Virginia Supreme Court ruled on the merits of an objection to the response for the first time on appeal, despite the fact that no objection had been made at trial. The

court found that "there is no merit to the objection. The instructions adequately informed the jury that they must find that Stamper killed the victims to convict him of the capital murders." *Stamper v. Commonwealth*, 220 Va. 260, 275, 257 S.E.2d 808, 819 (1979).

Accordingly, our having considered the contentions Stamper has made, and discovering no error,[5] the judgment is

AFFIRMED.

---

4. In fact, trial defense counsel made a pre-trial motion to keep Stamper's association with one Tyrone Bowling out of the case.

5. Finding no error, we leave to another day consideration of the Commonwealth's assertion

that reversal would constitute the enunciation of a "new rule" in violation of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and its progeny.