67 F.3d 298
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jimmy Lawrence NANCE, Defendant-Appellant.
 No. 93-5865
 United States Court of Appeals, Fourth Circuit.
 Sept. 13, 1995.
 
 Mark D. Kidd, OSTERHOUDT, FERGUSON, NATT, AHERON & AGEE, Roanoke, Virginia, for Appellant.
 Thomas Linn Eckert, Assistant United States Attorney, Roanoke, Virginia, for Appellee. ON BRIEF: Robert P. Crouch, Jr., United States Attorney, Roanoke, Virginia, for Appellee.
 Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Jimmy Lawrence Nance appeals his conviction for first degree murder of a United States Postal Service employee who was engaged in the performance of her official duties. See 18 U.S.C. Secs. 1111, 1114. We affirm.
 
 I.
 
 2
 On September 18, 1992, Donna Jean Stevenson, postmistress of the United States post office in Crockett, Virginia, was murdered. Her assailant beat her on the head and slashed her throat. Seven thousand dollars disappeared. A customer who arrived at the post office at 3:10 p.m. found Mrs. Stevenson lying on the floor in a pool of blood. Mrs. Stevenson had called her husband, Clyde Stevenson, at 3:00 p.m. Therefore, she was murdered between 3:00 and 3:10 p.m.
 
 
 3
 Between 3:30 and 4:00 p.m. Chris Marshall, a mail carrier who worked out of the Crockett post office, learned that Mrs. Stevenson was dead. He spoke to a deputy sheriff and gave a description of a man he had seen at the post office at about 1:35 p.m. Before the killing Mrs. Stevenson had told Marshall that the man's name was "Nichols." The man had been hanging around the post office calling a realtor about buying some property. Marshall told the deputy that the man was driving a large blue and white car with North Carolina tags ending with the numbers 8038.
 
 
 4
 Marshall's description of the man and car was immediately broadcast on police radio. This, in part, prompted a state trooper to stop Nance outside the Marion, Virginia, bus station that same evening. Nance agreed to talk to police and consented to a search of his car. The police interviewed Nance for several hours, and he gave a statement. Nance said that he left Rural Retreat, Virginia, that morning (September 18) between 7:30 and 8:00 a.m. and travelled to High Point, North Carolina, arriving there between 12:30 and 1:00 p.m. He claimed that he talked to Jerry Taylor while in High Point. Nance also said he spoke over the telephone with his aunt, Martha Henson, and with a person named Jerry Jones. According to Nance, he agreed to meet Jones at the Marion bus station that evening.
 
 
 5
 Nance denied ever being in the Crockett post office. He said that he did not even know where it was located. Nance admitted, however, that he knew Mr. and Mrs. Stevenson. He said that he met them two months earlier when he sold them some furniture. The Stevensons knew Nance as Jim Nichols. In addition to the furniture sales, Nance had performed a few odd jobs around the Stevensons' house.
 
 
 6
 Parts of Nance's story were contradicted. Martha Henson and Jerry Taylor testified that they did not speak with Nance on September 18, the day of the murder. That same day, from 9:30 to 11:00 a.m., Nance was seen in Granny's Kitchen Restaurant near Crockett. A short time later (between 11:30 a.m. and 12:30 p.m.), he was spotted in another nearby restaurant. Finally, he was in the Crockett Convenience Store sometime between 1:30 and 2:30 p.m. that day.
 
 
 7
 Marjorie Willis, a realtor with Town and Country Realty in Wytheville (which is near Crockett), received five telephone calls on September 18 between 12:45 and 2:30 p.m. from a man identifying himself as Jim Nichols. The man inquired about buying a house in the Crockett area and said that he was calling from the Crockett post office. Investigators recovered at the post office an envelope addressed to Town and Country Realty with a return address for Jim Nichols. An expert testified that the handwriting on the envelope was Nance's. Nance's fingerprints were also found on the envelope. The envelope bore a postal cancellation stamp dated September 18, 1992.
 
 
 8
 A search of Nance's car turned up several items, including two photographs of Mrs. Stevenson's nieces. She had carried both photos in her billfold. The car also contained three packs of Winston Ultra Light One Hundreds cigarettes, the same brand Mrs. Stevenson smoked.
 
 
 9
 Human blood was found on Nance's shoes, tee shirt, jeans, and baseball cap. DNA analysis indicated that the type of blood found on his clothes was consistent with Mrs. Stevenson's blood type. Mrs. Stevenson's blood type is shared by about eleven percent of the Caucasian population.
 
 
 10
 About a month after the murder a state highway worker found Mrs. Stevenson's car registration and operator's license on Interstate 77, six miles from the North Carolina border. Police searching the area later found her empty billfold. Nance made a telephone call from a Citgo station in this area at 7:37 p.m. on September 18.
 
 
 11
 At trial the government advanced robbery as the motive for the murder. In support of this theory, Clyde Stevenson testified that he gave his wife $5,000 on September 16 and asked her to put it in a safe at the post office. Mr. Stevenson also said that Nance knew that Mrs. Stevenson carried a lot of cash in her purse. The Stevensons had once paid Nance $1,685 in cash for some furniture. Shortly thereafter, Nance commented to a friend that it was crazy for Donna Stevenson to carry that much cash so far away from everything. After the murder the $5,000 was never found.
 
 
 12
 Evidence showed that Nance needed money. He owed $1,300 to Donald Hutchens. He stole some of Clyde Stevenson's checks only days before Mrs. Stevenson's murder, and he forged and uttered three of the checks. Finally, Nance stole $289 from his aunt two weeks before the murder.
 
 
 13
 A jury heard this evidence and convicted Nance. He was sentenced to life in prison.
 
 II.
 
 14
 Nance's first assignment of error concerns an improper question on redirect examination by the prosecutor to the Sheriff of Wythe County, Wayne Pike. On direct examination Sheriff Pike testified that Mrs. Stevenson's was the first murder in Wythe County since 1986. On cross-examination defense counsel apparently tried to plant the idea that the sheriff had failed to pursue other leads because he jumped too quickly to the conclusion that Nance was the murderer. The sheriff admitted saying publicly after Nance's arrest that "we [have] the prime suspect in this case" and "the people in Crockett [can] ... feel safe." In an apparent attempt to rehabilitate Sheriff Pike, the prosecutor asked the following question on redirect:
 
 
 15
 Q. Let me ask you this. The defendant--Since the defendant has been charged have you had any other murders in Crockett or in the Wytheville area?
 
 
 16
 Before Sheriff Pike could answer, defense counsel objected and asked for permission to make a motion outside the presence of the jury. The court sustained the objection but said that a motion was not needed. The court then instructed the jury to disregard the question. Later, before adjourning for the day, the court allowed defense counsel to return to this issue. Defense counsel moved for a mistrial, and the motion was denied.
 
 
 17
 Nance argues that the question to Sheriff Pike was so inherently inflammatory and prejudicial that the court should have declared a mistrial. We disagree after considering the following factors in the context of Nance's entire trial:
 
 
 18
 (1) Whether the remarks [or questions] were pronounced and persistent, creating a likelihood that the remarks [or questions] would mislead the jury to the prejudice of the defendant, (2) the strength of the properly admitted evidence against the defendant, and (3) the curative actions taken by the district court.
 
 
 19
 United States v. Brockington, 849 F.2d 872, 875 (4th Cir.1988).
 
 
 20
 First, the question to the sheriff was neither pronounced nor persistent. Rather, it was a single, unanswered question in the context of a six-day trial with nearly fifty witnesses. Second, as the facts in part I illustrate, there was substantial "strength[to] the properly admitted evidence against [Nance]." Id. Third, the district court responded to the question with an immediate curative instruction. Although we believe the prosecutor stepped out of bounds in asking the question, the court did not err in refusing to declare a mistrial.
 
 III.
 
 21
 Nance next claims that the government failed to prove that the body examined by Dr. David Oxley, the state medical examiner, was the body of the victim, Mrs. Stevenson. Thus, Nance argues that the district court erred in failing to grant his motion for judgment of acquittal. Dr. Oxley testified on direct examination that he had performed an autopsy on the body of Mrs. Stevenson. On cross-examination Dr. Oxley said that Mrs. Stevenson's body was identified for him by Dr. Michael Stoker, the local (Wythe County) medical examiner. Nance asserts that because Dr. Oxley's identification of the body was based on hearsay, none of his testimony about the autopsy was admissible.
 
 
 22
 We believe that Nance waived any objection to Dr. Oxley's testimony. "[T]o preserve for appellate review an objection to evidence, the objection must be '(1) specific, (2) timely, and (3) of record.' " United States v. Parodi, 703 F.2d 768, 783 (4th Cir.1983); see Fed.R.Evid. 103. Timeliness requires that the objection be made at the time the evidence is offered. Parodi, 703 F.2d at 783. "An objection not properly invoked 'is waived.' " Id.
 
 
 23
 Nance made no objection on any ground at the time of Dr. Oxley's testimony. Instead, some thirty witnesses later, at the close of the government's case, Nance "move[d] to exclude all of [Dr. Oxley's] testimony" in connection with his motion for judgment of acquittal. The objection to Dr. Oxley's testimony was not timely and was therefore waived.
 
 
 24
 Having failed to raise a timely objection, Nance can only prevail if we find "plain errors or defects effecting substantial rights." Fed.R.Crim.P. 52(b). To reverse for plain error, the burden is on the defendant to: "(1) identify an error; (2) which is plain; (3) which affects substantial rights; and (4) which 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " United States v. Moore, 11 F.3d 475, 481 (4th Cir.1993), cert. denied, 114 S.Ct. 1864 (1994). An error "affects substantial rights" when the error is prejudicial. United States v. Olano, 113 S.Ct. 1770, 1777-78 (1993). In other words, the error must have affected the outcome of the trial. Id. at 1778.
 
 
 25
 There was testimony from several witnesses who saw Mrs. Stevenson's body in a pool of blood on the post office floor. Indeed, at trial the defense did not argue that Mrs. Stevenson had not been murdered; it just argued that Nance was not the murderer. Thus, the identity of the corpse was not really in issue. Even assuming it was error not to strike Dr. Oxley's testimony, no substantial rights were affected because the failure to strike did not affect the outcome of the case.
 
 IV.
 
 26
 Nance next argues that the evidence was insufficient to convict him for the murder. When reviewing a sufficiency-of-the-evidence challenge, we view the evidence in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80 (1942), and we ask whether "any rational trier of fact could have found the essential elements of the crime [charged] beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The verdict must stand if there is substantial evidence to support it. Glasser, 315 U.S. at 80.
 
 
 27
 The evidence adduced at trial is described in part I, and we will not repeat it in detail here. We merely note that the government proved that Nance had the opportunity to murder Mrs. Stevenson, that he had a motive, and that he knew Mrs. Stevenson carried large sums of cash on her person. His alibi to the police proved to be false. Two photographs that Mrs. Stevenson carried in her billfold were found in Nance's car. Blood on Nance's clothes was consistent with Mrs. Stevenson's. Her billfold was found on Interstate 77 near a Citgo station from which Nance placed a phone call around 7:30 on September 18, 1992.
 
 
 28
 Nance essentially argues that the government left certain questions unanswered. For example, no murder weapon was ever found. However, the government is not required to explain away every hypothesis of innocence. See Stamper v. Muncie, 944 F.2d 170, 174 (4th Cir.1991). All put together, there was sufficient evidence from which a rational jury could have found Nance guilty beyond a reasonable doubt.
 
 V.
 
 29
 Nance argues on this direct appeal that he received ineffective assistance. However, the record does not conclusively show ineffec tive assistance of counsel. Accordingly, any such claim should be raised in a motion for relief under 28 U.S.C. Sec. 2255. See United States v. Williams, 977 F.2d 866, 871 (4th Cir.1992), cert. denied, 113 S.Ct. 1342 (1993).
 
 VI.
 
 30
 Finally, Nance argues that the trial court committed reversible error by admitting certain evidence of other crimes. The court admitted two pieces of evidence under Fed.R.Evid. 404(b): that Nance stole $289 from his aunt about two weeks before the murder and that Nance forged and uttered Clyde Stevenson's checks the week of the murder. The government contends that this evidence was properly admitted to prove motive. Evidence of other crimes and wrongs is not admissible to show bad character but may be admissible as "proof of motive," "intent," or "plan." Id. The probative value of such evidence must be weighed against the danger of undue prejudice. United States v. Rawle, 845 F.2d 1244, 1247 (4th Cir.1988). Decisions under 404(b) are committed to the trial court's discretion and will not be disturbed unless arbitrary or irrational. Id. The district court here did not abuse its discretion in concluding (i) that the evidence of very recent thievery was probative of motive for robbery and (ii) that the evidence was not unduly prejudicial.
 
 
 31
 The court also admitted an out-of-court statement by Nance that he owed back child support and that he took his aunt's car without permission. Nance argues that the trial court erred by allowing this evidence under Rule 801(d)(2) (admission by party-opponent) after concluding that the evidence was inadmissible (as irrelevant) under 404(b). We agree with Nance that the trial court erred in admitting this evidence under 801(d)(2) after excluding it under 404(b). Once evidence is determined to be irrelevant, it cannot then be admitted under some other rule. The error here, however, was harmless. Nonconstitutional error is harmless if it can be said with fair assurance after considering the entire record that the judgment was not swayed by the error. United States v. Urbanik, 801 F.2d 692, 698 (4th Cir.1986). In this case the court gave the jury a general cautionary instruction as part of its final charge, stating that "[t]he defendant is not on trial for any act or conduct or offense not alleged in the indictment." After considering the entire record, we can say with fair assur ance that the jury was not swayed to convict Nance for murder because of the evidence about his child support arrearages and his taking of a relative's car without permission.
 
 VII.
 
 32
 Nance's conviction is affirmed.
 
 AFFIRMED