# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-20323

United States Court of Appeals
Fifth Circuit

**FILED**

July 27, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

　　Plaintiff - Appellee

v.

STANLEY IKENNA OKPARA,

　　Defendant – Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:18-CR-178-1

Before CLEMENT, SOUTHWICK, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Stanley Okpara was indicted on two counts of knowingly using a counterfeit passport to open two bank accounts. A jury convicted him of both counts following a jury trial. On appeal, Okpara argues that the district court plainly erred by failing to issue a limiting instruction to the jury, *sua sponte*, regarding impeachment evidence. Okpara also challenges the admission of testimony from United States Postal Inspector Matthew Boyden on the grounds that it was improper impeachment evidence and the district court's application of the Guidelines.

We conclude that the district court plainly erred when it did not issue a limiting instruction to the jury regarding the use of impeachment evidence.

No. 19-20323

Therefore, we VACATE and REMAND. Because we vacate on this basis, Okpara's evidentiary challenge and his challenge to the district court's application of the Guidelines are moot and, therefore, we do not address them.

I.

A.

In March 2018, Okpara, a Nigerian national, was indicted on two counts of knowingly using a counterfeit Republic of Ghana passport under the name Kuffor George[1] to open bank accounts at Bank of America and JP Morgan Chase Bank. Okpara was tried before a jury on both counts. During trial, the government presented testimony from (i) three fraud investigators from various banks;[2] (ii) testimony from Uzoma Ajaero, an acquaintance of Okpara's who was also charged with—and convicted of—using fraudulent passports to open bank accounts; and (iii) testimony from United States Postal Inspector Matthew Boyden. For purposes of this appeal, the relevant testimony is that from Ajaero and Inspector Boyden.

Ajaero, also a Nigerian national, testified that at the time of trial he had known Okpara for about five years.[3] Ajaero testified that he personally opened bank accounts in Houston using false passports in the names of Levi Pepple and Althan Dandison, including one account at IBC Bank in Dandison's name. That account listed the same address as Chase and Bank of America accounts

---

[1] At trial, the parties referred to the name in the passport as "George Kuffor" or "Kuffor George." In the indictment, the government referred to the name in the passport as "George Kwame Kuffor." The passport itself is in the name of "Kuffor George" and, therefore, for consistency, we refer to the name in the passport as such.

[2] These investigators included one investigator from each of JP Morgan Chase Bank, Bank of America, and First National Bank of Texas.

[3] Prior to Okpara's trial, Ajaero was convicted of two counts of passport fraud and sentenced to 21 months' imprisonment. At the time of Okpara's trial, Ajaero had completed his sentence and he was subject to a final order of removal, meaning he had been ordered deported and his removal was imminent.

associated with the name George Kuffor. When the government presented Ajaero with a cashier's check made payable to Dandison from an account at First Convenience Bank in the name of "Kuffor George," Ajaero testified that (i) he could not "positively remember" whether he received the cashier's check; (ii) he was not sure whether he had been shown the check before; and (iii) he was not sure who was using the name Kuffor George.

When asked whether he had a passport made for Okpara, Ajaero responded that he wasn't sure. When asked if he had "previously stated" that he did have a counterfeit passport made for Okpara, Ajaero responded that he "may have said so in error." Ajaero testified that he was not sure whether Okpara ever gave him a headshot or passport photograph, but there "may be" a passport photograph of Okpara on his phone. Ajaero also testified that he was not sure whether he obtained a passport under the name of Kuffor George for Okpara. The government then asked Ajaero whether he had told Inspector Boyden that he did, in fact, obtain a passport for Okpara. Ajaero responded:

> What I said earlier and like I said now is that if I did make passports, I'm not sure I did make that passport, because I made a series of passports, some of them successfully got received and a lot of them probably not received. But I wouldn't state categorically that I did that, that's a correct passport or I didn't do that, that's a correct passport.

Ajaero agreed that he recalled speaking to Inspector Boyden the "Friday afternoon" before trial began.[4] When asked whether he told Boyden that he obtained Okpara's counterfeit passport from the same person who made his counterfeit passport, Ajaero responded:

> Like I said, I had a series of passports made. Some of them came through. Some of them didn't come through. So I wouldn't be specific to, like, remember which ones came through and which ones did not come through. And I wouldn't also know the exact

---

[4] The prosecutor conducting Ajaero's examination was also present at this meeting.

ones that I made and the ones I didn't make, because like I said, it was through a third party.

Finally, when asked if he had been certain during the meeting the Friday before trial about providing Okpara with the passport, Ajaero answered: "No, I wasn't certain." Then, when asked again whether Ajaero told Boyden that he obtained the Kuffor George passport for Okpara, Ajaero responded:

> What I said to you on Friday was that I may have made that passport, but another thing again is that some of the other passports which I made didn't come through because they actually got -- they actually got seized probably by Customs, but I know that there were -- most of the passports which I made that came through were just a couple. I don't remember if I mentioned that, but I know that for sure. I made a couple of passports, but not all of them came through. So if I made this one, I wouldn't claim responsibility of it, because I don't know.

Ajaero's testimony ended soon after this statement and the government proceeded to call Boyden to the stand.

## B.

Inspector Boyden was the government's final witness. Boyden testified that he interviewed Ajaero "several times," including when Ajaero was being prosecuted for passport fraud. Boyden testified that during that meeting, he showed Ajaero the cashier's check from Kuffor George to Dandison and asked Ajaero (i) who gave him the cashier's check; and (ii) who Kuffor George was. When the government asked Inspector Boyden how Ajaero responded to these questions, Okpara's counsel objected that the testimony was hearsay and improper impeachment. Outside the presence of the jury, the district court overruled the objection and held the testimony was admissible "for th[e] limited purpose of impeach[ing]" Ajaero's credibility.[5] The jury then returned

---

[5] Specifically, the district court ruled that "[b]ecause the government offered Ajaero an opportunity to explain or deny this statement and because there was an opportunity to

and Boyden's testimony continued. Before the government elicited further testimony from Boyden, however, the district court did not give a limiting instruction to the jury.

Boyden testified that Ajaero previously stated that (i) Okpara gave Ajaero the relevant cashier's check; (ii) Okpara held the Kuffor George account; and (iii) Ajaero obtained a counterfeit passport for Okpara in the name of Kuffor George. Defense counsel's cross-examination emphasized that Ajaero's purportedly impeaching statement was unrecorded and given two years earlier.

On redirect, Boyden was asked whether he had "any confusion about what Ajaero said" regarding the cashier's check and passport. Boyden responded unequivocally: "None at all." Boyden also explained that he spoke with Ajaero about the cashier's check and passport on more than the one occasion referred to on direct examination. In addition to the 2017 interview, Boyden spoke with Ajaero about the cashier's check and passport on two other occasions. When asked whether Ajaero was "consistent and clear" across these various meetings, Boyden responded:

> Yeah. He's definitely reluctant to tell on his friend. He was unequivocal about that. But he was also unequivocal that it was his friend, Mr. Okpara, in the videos, on the passport, that he gave him the passport, that he provided him addresses to use for the fraud accounts, that he sent money to an account opened in the name of Mr. Kuffor.

When defense counsel objected to this testimony as improper narrative and non-responsive, the district court sustained the objection. However, counsel did not move to strike this testimony from the record. Boyden's testimony concluded soon thereafter.

---

examine Ajaero on cross-examination, the statement is admitted for that limited purpose of impeachment. That's the ruling."

No. 19-20323

C.

Prior to closing arguments, the district court charged the jury. Defense counsel did not request an instruction regarding the use of impeachment testimony, and the district court did not issue any such instruction. The district court did instruct the jury to "disregard . . . entirely" all "questions and exhibits" where objections were sustained.

D.

During closing argument, the government summarized the evidence presented to the jury and identified the evidence tying Okpara to the charged crimes. The government characterized Ajaero's testimony as "not answering the question" because "he didn't want to testify against his friend." The government then summarized Boyden's testimony regarding Ajaero's prior statements.

In its rebuttal, the government reiterated Boyden's testimony impeaching Ajaero, recounting Boyden's testimony in greater detail and characterizing Ajaero's statements to Boyden as "the truth":

> Inspector Boyden says Mr. Ajaero was very clear all three times, that he gave the defendant the Kuffor George passport. He was very clear and unequivocal all three times that he received this $10,750 from the defendant. He was very clear and unequivocal that the defendant asked him for a passport and provided him with a headshot photo for it.
>
> . . . .
>
> The truth of the matter here is, what Mr. Ajaero told Inspector Boyden all three times is what the truth is, and that is, that he did give the defendant the passport and the defendant did use the Kuffor George passport and is guilty as charged.
>
> . . . .
>
> I submit to you that the truth of the matter is Mr. Ajaero told the truth to Inspector Boyden and came to court and became evasive to help his friend. The fact of the matter is, the proof in this case

shows that Mr. Ajaero gave the defendant the Kuffor George passport.

E.

During deliberations, which lasted about five and a half hours and spanned two days, the jury requested the transcripts of Ajaero's and Boyden's testimony. In response, the district court ordered an oral read-back of the testimony excluding any bench conferences or "give and take" between the attorneys. A copy of the transcript that was actually read back to the jury shows that the page of the transcript where the district court issued its impeachment-only instruction to the government (which was given outside the presence of the jury) was not included. This transcript also shows that the district court's decision sustaining Okpara's objection to certain Boyden testimony was crossed out and, therefore, likely not read back to the jury. The court reporter began reading back the testimony at 10:00 a.m. on January 30, 2019. By 11:36 a.m., the jury had rendered a verdict finding Okpara guilty on both counts of the indictment.

F.

Following Okpara's conviction, a United States probation officer prepared a presentence investigation report ("PSR"). The PSR recommended a sentencing range of 33 to 41 months of imprisonment. Over Okpara's objections, including objections to the offense level computation and sentencing range, the district court adopted the PSR. The district court sentenced Okpara to two concurrent terms of 41 months' imprisonment and three years of supervised release, and imposed a $200 special assessment. Okpara timely appealed.

No. 19-20323

II.

Okpara argues that the district court plainly erred by failing to issue a limiting instruction to the jury, *sua sponte*, regarding impeachment evidence. Okpara also challenges the admission of certain testimony from Boyden as improper impeachment evidence, as well as the district court's application at sentencing of the Guidelines. Because we conclude that the district court plainly erred when it neglected to give its limiting instruction to the jury regarding the use of impeachment evidence, Okpara's evidentiary and sentencing challenges are moot.

A.

Okpara acknowledges that the failure to give an impeachment-only limiting instruction must be assessed for plain error, citing *United States v. Delgado*, 401 F.3d 290, 299 (5th Cir. 2005). In this context, "[p]lain error appears only when the impeaching testimony is extremely damaging, the need for the instruction is obvious, and the failure to give it is so prejudicial as to affect the substantial rights of the accused."[6] *United States v. Waldrip*, 981 F.2d 799, 805 (5th Cir. 1993) (quoting *United States v. Barnes*, 586 F.2d 1052, 1058 (5th Cir. 1978)); *see also United States v. Sisto*, 534 F.2d 616, 626 (5th Cir. 1976) ("We will find plain error in a trial court's failure *sua sponte* to" instruct the jury on the proper use of impeachment evidence "only when the impeaching evidence is extremely damaging, the need for the instruction is obvious, and the remainder of the Government's case is not strong.").

---

[6] Though this standard differs slightly from the modern plain error standard we apply in most contexts, our precedent requires that—in this particular context—we apply this rendition of the standard. *See, e.g.*, *United States v. Maes*, 961 F.3d 366, 374 (5th Cir. 2020) (applying this standard where the defendant, for the first time on appeal, challenged the district court's failure to *sua sponte* issue a limiting instruction).

No. 19-20323

B.

In *United States v. Sisto*, we found a district court's failure to issue an impeachment-related limiting instruction *sua sponte* to be plain error. 534 F.2d at 626. There, the defendant was charged with one count of importing a controlled narcotic substance. *Id.* at 617–18. The central factual dispute was whether the defendant knew that the substance in a bottle he imported was liquefied cocaine. *Id.* at 620–21. The defendant's alleged accomplice denied making statements incriminating the defendant to an undercover agent. *Id.* at 618–19. In an effort to impeach the accomplice, the government called the undercover agent as a rebuttal witness, who recounted the accomplice's out-of-court statements. *Id.* at 619–20. In its closing and rebuttal arguments, the government asserted that the accomplice had told the undercover agent the "whole story," and relied on the agent's recounting of the prior statement to bolster the theory that the defendant knew he was smuggling drugs. *Id.* at 620–21, 625. Defense counsel did not request, and the district court did not give, an impeachment-related limiting instruction.[7] *Id.* at 621.

Reviewing for plain error, this court determined the agent's testimony was "extremely damaging" to the defendant because it was the only evidence from which the jury could infer the defendant's knowledge, which was the primary contested issue in the case. *Id.* at 624. Next, this court concluded that the need for a limiting instruction was obvious because the defendant's objection to the testimony on the grounds that the testimony was inadmissible hearsay "should have underscored to the court the need for a cautionary instruction." *Id.* Finally, this court concluded the defendant's substantial rights were affected because (i) the agent's testimony was "presented to the

---

[7] Further, the district court in *Sisto* did not instruct the government to limit its use of impeachment testimony outside the presence of the jury, distinguished from the instant case.

No. 19-20323

jury as the only direct evidence of" the defendant's knowledge, and therefore "must have been a major factor in the jury's deliberation"; (ii) the court instructed the jury at the close of evidence that it could rely on all testimony to make its determinations without limitation; and (iii) the government's closing argument rested on the impeachment testimony. *Id.* at 625–26.

## C.

Adhering to our legal framework from *Sisto*, we hold that the district court's failure to issue a limiting instruction consistent with its instruction to counsel regarding Boyden's testimony was plain error. As the district court instructed the government, Boyden's impeaching testimony should have been used by the jury solely for the purpose of assessing Ajaero's credibility, but the jury was never told as much. Because this conclusion is fact-specific, we take pains to assess Boyden's testimony using the *Sisto* factors. *Waldrip*, 981 F.2d at 805 ("Although [we have held it is] plain error in the trial judge's failure sua sponte to instruct the jury as to the limited use of evidence of other offenses, [we have not] establish[ed] a *per se* rule. Just as in the case of impeachment evidence, our inquiry will focus and depend on the particular facts of each case.").

### 1.

First, Boyden's testimony was extremely damaging to Okpara. Boyden's testimony about Ajaero's prior statements was "nothing less than devastating against [Okpara] in respect to the one contested issue in the case": whether Okpara obtained, possessed, and used the counterfeit Kuffor George passport. *See Sisto*, 534 F.2d at 624. Ajaero's alleged statements to Boyden "constituted the only evidence from which the jury could directly conclude" that Okpara obtained a counterfeit passport under the name Kuffor George. *See id.*

The only remaining evidence of Okpara's guilt presented at trial did not directly link Okpara to the fraudulent passport or the bank accounts. This

10

evidence included the fact that a man who withdrew funds from one of the accounts two months after it was opened arguably looks like Okpara; Okpara's unique facial feature (a birthmark above his right eye), arguably consistent with the photograph in the Kuffor George passport used to open the Chase bank account; the proximity of the accounts and financial transactions to Okpara's residence; Ajaero's testimony that he knew Okpara; Ajaero's testimony that he obtained fraudulent passports for others; that he "may" have a passport photo of Okpara on his phone; and that the at-issue bank accounts were opened using the same address as Ajaero's fraudulent accounts.

Notably, not one of the testifying bank employees could identify Okpara as the person who opened the at-issue bank accounts.[8]

Missing from the government's evidence is anything directly tying Okpara to the Kuffor George passport and proving his use of that passport to open the relevant bank accounts or at any other time. Indeed, while the government alleged Okpara used the counterfeit passport to open two bank accounts, no eyewitness testified that Okpara is the one who opened the accounts, there was no video surveillance or evidence presented from the days the accounts were opened, and the passport used to open the Bank of America account was never admitted into evidence.[9] Given that Boyden provided direct evidence linking Okpara to the crime, his impeaching testimony—when taken by the jury as substantive evidence—was extraordinarily damaging to Okpara.

2.

Second, the need for a limiting instruction was obvious. Like the district court in *Sisto*, the district court here recognized that Boyden's impeaching

---

[8] Notably also, Boyden's testimony came in as part of the government's case-in-chief. *Cf. Barnes*, 586 F.2d at 1055, 1058–59, 1059 n.8 (distinguishing *Sisto* on harmlessness grounds).

[9] The government did admit a photocopy of the Kuffor George passport used to open the Chase bank account.

testimony was admissible "for th[e] limited purpose of impeach[ing]" Ajaero's credibility. *See id.* at 624. Inexplicably, the district court never communicated this limitation to the jury, and the government, which was instructed to limit its use of this evidence, ignored the instruction. Whereas, like Sisto's hearsay objection to the agent's testimony "should have underscored to the court the need for a cautionary instruction," *id.*, Okpara's hearsay objection actually did correctly lead the district court to caution the government.

### 3.

Third, the district court's failure to issue a limiting instruction *sua sponte* affected Okpara's substantial rights. *See id.* at 625–26 (finding defendant's substantial rights affected where "the remainder of the Government's case [wa]s not strong"). As recounted above, Boyden's impeaching testimony was the government's direct evidence tying Okpara to the Kuffor George passport. Indeed, much of the evidence the government relied on to link the passport to Okpara could apply equally to Ajaero. While we recognize "that circumstantial evidence is no less probative than direct evidence," *Stamper v. Muncie*, 944 F.2d 170, 174 (4th Cir. 1991), "[t]he circumstantial proof must be susceptible of inferences from which the jury might reasonably have found guilt beyond a reasonable doubt," *United States v. Gandolfo*, 577 F.2d 955, 959 (5th Cir. 1978). As explained above, the circumstantial evidence here was not "of the type and quality necessary to sustain a conviction." *Gandolfo*, 577 F.2d at 957. In sum, we are not "convinced that the jury rejected [Okpara]'s defense on some basis other than [Boyden's] testimony." *Sisto*, 534 F.2d at 626.

Additionally, as in *Sisto*, the district court's actual instructions to the jury led it to believe that it could rely on all of the testimony elicited during trial for any purpose, unless an objection to the testimony was sustained during trial. *See id.* at 625. The district court told the jury:

12

- "[I]t's your duty to determine the facts. To do so, you must consider only the evidence presented during the trial. Evidence is the sworn testimony of the witnesses, including stipulations and exhibits."
- "Your verdict must be based solely on the legally admissible evidence and testimony."
- "You are the sole judges of the credibility or believability of each witness and the weight to be given the witness's testimony."

Because the district court did not alert the jury that its usage of vital government agent testimony should be considered for limited use only, and because the government, contrary to the sidebar instruction it had been given, used this testimony for its truth, the jury was left with the clear impression that it could rely on *all* admitted testimony equally and for any purpose. Thus, the district court's instructions "encourage[d] the jury to treat [Boyden]'s testimony as direct evidence of [Okpara]'s" guilt. *Id.* at 626.

Boyden's testimony affected Okpara's substantial rights for three additional and independent reasons: (1) the government relied heavily on Boyden's testimony during its closing and rebuttal arguments; (2) the jury requested a transcript of Boyden's testimony during deliberations and reached its verdict swiftly after hearing that testimony read back; and (3) the presentation of evidence lasted one day,[10] meaning Boyden's testimony constituted a sizable portion of the evidence the jury heard.

The government highlighted Boyden's impeaching testimony during its closing and rebuttal arguments. But the government did not confine its use of Boyden's impeaching testimony to its permissible purpose—impugning Ajaero's credibility. Instead, opposite to the district court's caution, the government emphasized that Ajaero's statements to Boyden were "the truth." In doing so, the government told the jury that Boyden's testimony about

---

[10] All testimony and evidence were presented in one day. Closing arguments were held the following afternoon, and the jury rendered its verdict the morning thereafter.

Ajaero's statements should be treated as substantive evidence about what Ajaero *actually said*, rather than to assess Ajaero's credibility. Thus, regrettably, the prejudicial impact of the district court's oversight was "exacerbated by the prosecution's closing arguments," as in *Sisto*.[11] *Id.*

During deliberations, the jury requested a transcript of Boyden's testimony. The district court ordered that Boyden's testimony be read back to the jury, however, excluding attorney colloquies and bench conferences. This means that, while the jury was reminded of Boyden's testimony during deliberations, the jury was likely not informed either that Okpara's counsel objected to portions of that testimony, or that the district court had actually admitted the testimony for impeachment use only.[12] Shortly after Boyden's testimony was read back, the jury rendered its verdict. The jury's apparent interest in, and reliance on, Boyden's unfettered testimony supports Okpara's argument that his substantial rights were affected by the district court's failure to give its limiting instruction. *See United States v. Foster*, 753 F. App'x 307, 314–15 (5th Cir. 2018) (finding admission of videotaped depositions, in violation of defendant's Sixth Amendment confrontation right, was not harmless where the only evidence the jury asked for during deliberations were the videotaped depositions).

Finally, the presentation of evidence in this case lasted only one day. The relatively short trial increases the likelihood that the jury improperly relied on Boyden's impeaching testimony to Okpara's detriment. *Cf. Maes*, 961 F.3d at

---

[11] In its briefing before this court, the government candidly "acknowledges that the prosecutor's closing argument referencing Inspector Boyden's impeachment testimony is somewhat similar to the closing argument in *Sisto*."

[12] The jury was instructed to "disregard those questions and exhibits" for which the district court sustained objections. But even for the small portion of Boyden's testimony as to which the district court did sustain an objection, the jury was read all of the objectionable testimony, but was likely not read the accompanying objection or the district court's decision sustaining the objection.

375 (finding it relevant that a trial lasted multiple days when determining that "a few questions" about the defendant's arrest record were not prejudicial).

## D.

In sum, "we are in doubt as to what the jury's verdict would have been had the proper instruction been given." *Sisto*, 534 F.2d at 624. Boyden's impeaching testimony—which, in the absence of a limiting instruction, the jury likely took as affirmative evidence against Okpara—was extremely damaging to Okpara. The need for a limiting instruction was obvious, as even the district court recognized (outside the presence of the jury) that limiting the use of the testimony was warranted. Finally, in the absence of Boyden's impeaching testimony, the government's case was contestable. Thus, Boyden's impeaching testimony affected Okpara's substantial rights. Indeed, the jury asked for Boyden's testimony just before rendering its verdict against Okpara, the government relied heavily on Boyden's impeaching testimony for its truth, and the presentation of evidence lasted just one day. Though "cases in which these factors coalesce [are] rare," we find them present here. *Id.* at 626.

## III.

For these reasons, we VACATE and REMAND.